# ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MAGNELL ASSOCIATE, INC., d/b/a ABS
Computer Technologies, Inc. and NEWEGG
INC.,

Plaintiffs,

v.

FRANLKIN FIRST FINANCIAL, Ltd.,

Defendant.

08 Civ. _____

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★  **SEP 29 2008**  ★

COMPLAINT **BROOKLYN OFFICE**

**CV 08      3971**

**SPATT, J.**          **ORENSTEIN, M.J.**

Plaintiffs, Magnell Associate, Inc. d/b/a ABS Computer Technologies, Inc. and its

parent company Newegg Inc. (collectively "Magnell") for their Complaint, allege as follows:

## INTRODUCTION

1.      Magnell seeks to recover money damages from Defendant for the breach

of two contracts – a Sublease Agreement (Ex. A) and a Repayment Agreement (Ex. B).

Defendant failed to pay Magnell the $8,343 monthly rent due pursuant to the Sublease

Agreement from June 2007 through November 2007.  Due to its failure to pay the rent owed, on

November 16, 2007, Defendant entered into a Repayment Agreement, under which it agreed to

pay a lump sum of $25,000 and the remaining amount of $25,058 in 12 equal monthly

installments of $2,088.17, and to continue making the $8,343 monthly rent payments under the

Sublease Agreement until its termination on February 28, 2009.  In June 2008, however,

Defendant stopped making payments under the Repayment Agreement.  Defendant also stopped

paying its rent in May 2008.  Without informing Magnell, Defendant abandoned the premises in

or about June or July 2008.

## PARTIES

2.     Plaintiff Magnell Associate, Inc. d/b/a ABS Computer Technologies, Inc. was and still is a domestic business corporation.  It is incorporated in California and has its principal place of business in City of Industry, California.  Plaintiff Magnell Associate, Inc. is a subsidiary and affiliate of Newegg Inc.

3.     Plaintiff Newegg Inc. is a domestic business corporation.  Newegg Inc. is incorporated in Delaware and has its principal place of business in City of Industry, California.

4.     At all times relevant, Magnell Associates Inc. and its parent company Newegg Inc. (hereinafter "Magnell" or "Overtenant") subleased part of the first floor of 600 Parsippany Road in Parsippany, New Jersey to Defendant (hereinafter "Defendant" or "Undertenant").

5.     Defendant First Franklin Financial is and was a domestic business corporation.  It is incorporated in New York and has its principal place of business in Nassau County, New York.  At all times relevant, Defendant subleased part of the first floor of 600 Parsippany Road in Parsippany, New Jersey from Magnell.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The Defendant and Plaintiffs are citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Defendant resides in the Eastern District of New York.

## JURY DEMAND

8.     Plaintiffs demand trial by jury in this action.

2

## FACTUAL BACKGROUND

9.     On November 21, 2003, Magnell entered into a Lease with Parsippany Associates, L.L.C. ("Overlandlord") to lease the first floor of the premises located at 600 Parsippany Road in Parsippany, New Jersey.

10.     On July 24, 2005, Defendant entered into a Sublease Agreement with Magnell to sublease this premises from Magnell. A copy of the Sublease Agreement is attached as Exhibit A.

11.     The terms of the Sublease Agreement are briefly as follows:

    a.     Term: September 15, 2005 to February 28, 2009;

    b.     Rental: $7,647.75 fixed base rent per month plus additional rent for a total regular rent ("Rent") of $8,343 per month;

    c.     Security Deposit: One month's Rent, which is $8,343; and

    d.     Law of Construction: New Jersey.

12.     The Sublease Agreement explicitly incorporated, with minor irrelevant exceptions, a copy of the Lease between Magnell and the Overlandlord. The Sublease Agreement, at ¶ 2F, states: "Overtenant shall have the same rights and remedies with respect to a breach of this Sublease by Undertenant as Overlandlord has with respect to a breach by Overtenant." Relevant terms of the Lease are briefly as follows:

    a.     The monthly rent is payable in advance on the 1st of each month during the lease term;

    b.     Lessee shall pay a late charge of 8% on any rent paid after the due date, though one late charge per year shall be waived if the rent is paid by the 15th day of the month;

c.      If the rent is not paid or the tenant deserts, abandons, or vacates the premises, the lessor may give the lessee notice of such default.  If the lessee does not cure the failure to pay rent within five days or any other default within fifteen day of receiving such notice, then lessor may terminate the lease on not less than ten days notice.  If the lease is terminated due to lessee's default, lessee's right to possession shall cease and lessee shall become immediately liable for the rent due until the expiration of the lease term, along with "such expenses as Lessor may incur, including, without limitation, court costs and reasonable attorney's fees and disbursements, in enforcing the performance of any obligation of Lessee under this Lease." Lease ¶ 13, attached to Ex. A.

13.      Defendant failed to pay Magnell the $8,343 monthly Rent due pursuant to the Sublease Agreement from June 2007 through November 2007.

14.      To prevent Magnell from terminating the Sublease Agreement and to repay back Rent, on November 16, 2007, Defendant entered into a Repayment Agreement, under which it agreed: (a) to pay a lump sum of $25,000 and the remaining outstanding amount of $25,058 in 12 equal monthly installments of $2,088.17; and (b) to continue making the $8,343 monthly Rent payments under the sublease until its termination on February 28, 2009.  The Repayment Agreement also provides that if Defendant is late on either its regular Rent or the payments due under the Repayment Agreement then Defendant must pay 8.5% interest, compounded monthly, on any overdue payments.  A copy of the Repayment Agreement is attached as Exhibit B.

4

15.     Although Defendant made the initial payments under the Repayment Agreement, Defendant has not made a payment under the Repayment Agreement since June 2008. Moreover, Defendant has not paid Rent since May 2008.

16.     Without notifying Magnell, Defendant deserted the premises in or about June or July 2005.

17.     Magnell provided Defendant written notice of default on or about August 29, 2008.

18.     Defendant failed to cure the default.

19.     On or about September 11, 2008, Magnell provided Defendant formal written notice that the Sublease Agreement would terminate in ten days.

20.     Defendant again failed to cure the default.

21.     The Sublease Agreement therefore has terminated.

22.     Pursuant to the Sublease Agreement, Defendant presently owes Magnell the regular Rent of $8,343 for nine months – June 2008 through February 2009. This totals $75,087. Pursuant to the Lease that was incorporated into the Sublease Agreement, Defendant may also be charged an 8% late fee for failure to pay by the first of each month. Upon entering into the Sublease Agreement, Defendant paid a security deposit of $8,343 for which Magnell will credit it. Pursuant to the Sublease Agreement at ¶ 2F, which incorporates ¶ 13 of the Lease, Defendant must also pay all of Magnell's "court costs and reasonable attorney's fees and disbursements" incurred in attempting to secure payment from Defendant and in prosecuting this action.

23.     Defendant therefore owes the sum of $66,744 due to its breach of the Sublease Agreement, plus interest, attorneys' fees, and costs.

24.     Furthermore, Defendant breached the Repayment Agreement.  Defendant failed to pay the repayment amount of $2,088.17 for five months – July 2008 through November 2008.  This totals $10,440.85.  The Repayment Agreement also provided that Defendant must pay 8.5% interest, compounded monthly, on any overdue Rent payments and on any repayment payments.

25.     Defendant therefore currently owes $66,744 for breach of the Sublease Agreement, $10,440.85 for breach of the Repayment Agreement, in addition to the interest set forth above.  Pursuant to the Repayment Agreement, this amount will continue to increase at the rate of 8.5% interest, compounded monthly, until paid in full.  In addition, as forth above, Defendant is liable for costs and attorneys' fees.

26.     Defendant has wholly failed and refused to pay this amount.

### FIRST CAUSE OF ACTION
### Breach of Contract (Sublease Agreement)

27.     Magnell repeats and realleges the foregoing paragraphs as through fully set forth herein.

28.     Magnell has duly performed all the conditions of the Sublease Agreement entered into with Defendant.

29.     Without cause or justification, Defendant breached the Sublease Agreement it had entered into with Magnell.

30.     Although duly demanded, Defendant abandoned the premises and has failed to pay the June 2008 through February 2009 rent of $8,343 per month.  Nor has Defendant paid the 8% monthly late charge.  Nor has Defendant paid the 8.5% monthly compounded interest.

31.     Upon entering into the Sublease Agreement, Defendant paid a security deposit of $8,343, for which Magnell will credit it.

32.     As set forth above, Defendant therefore owes Magnell the sum of $66,744 due to its breach of the Sublease Agreement, plus the interest set forth above, costs, and attorneys' fees.

## SECOND CAUSE OF ACTION
### Breach of Contract (Repayment Agreement)

33.     Magnell repeats and realleges the foregoing paragraphs as through fully set forth herein.

34.     Magnell has duly performed all the conditions of the Repayment Agreement entered into with Defendant.

35.     Without cause or justification, Defendant breached the Repayment Agreement entered into with Magnell.

36.     Defendant failed to pay the repayment monthly amount of $2,088.17 for five months – July 2008 through November 2008.  This totals $10,440.85.  The Repayment Agreement also provided that Defendant must pay 8.5% interest, compounded monthly, on any overdue rental payments and/or repayment payments.

37.     Accordingly, Magnell demands $10,440.85 plus the interest set forth above, costs, and attorneys' fees due to the breach of the Repayment Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that a judgment and order be issued:

a.  Awarding compensatory damages for Defendant's breach of the Sublease and Repayment Agreements plus interest;

b.  Awarding reasonable attorneys' fees, disbursements, and costs;

7

c.   Granting such other further relief as this Court finds appropriate and equitable.

Dated:  New York, New York          Respectfully submitted,
        September 26,  2008

                                    EMERY CELLI BRINCKERHOFF
                                      & ABADY LLP

                                    By: _____
                                        Matthew D. Brinckerhoff (MB 3552)
                                        Ilann M. Maazel (IMM 5724)
                                        Elizabeth S. Saylor (ESS 8091)
                                        Emery Celli Brinckerhoff & Abady LLP
                                        75 Rockefeller Plaza, 20th Floor
                                        New York, New York 10019
                                        Tel: (212) 763-5000
                                        Fax: (212) 763-5001
                                        *Attorneys for Plaintiff*

Exhibit A

SUBLEASE AGREEMENT

Sublease Agreement ("Sublease") made this 25th day of July, 2005 by and between Magnell Associate, Inc., d/b/a ABS Computer Technologies, Inc. ("Overtenant"), with an address of 9997 East Rose Hills Road, Whittier, California 90601 and Franklin First Financial, Ltd. ("Undertenant"), with an address of 329 Hempstead Turnpike, West Hempstead, New York 11552.

RECITALS:

A.     Overtenant, as "Lessee", and 600 Parsippany Associates, L.L.C. ("Overlandlord"), as "Lessor", with an address c/o Mack-Cali Realty Corporation, 11 Commerce Drive, Cranford, New Jersey 07016, entered into that certain Lease dated November 21, 2003 ("Lease") for a portion of the first floor at 600 Parsippany Road, Parsippany, New Jersey. Capitalized terms used herein are defined as defined in the Lease, unless specified to the contrary. A redacted but otherwise true and complete copy of the Lease is annexed hereto and made a part hereof.

B.     Overtenant desires to sublet to, and Undertenant desires to sublease from, the Premises for the Term of September 15, 2005 to February 28, 2009, all subject to the terms and conditions set forth herein.

NOW, THEREFORE, the parties, agreeing to be legally bound, in consideration of the mutual promises and premises set forth herein, do hereby agree as follows

1.     AGREEMENT TO SUBLEASE PREMISES/TERM: Overtenant sublets the Premises to the Undertenant, and Undertenant subleases the Premises from Overtenant, for the term commencing on the "Sublease Commencement Date" (as defined in Article 16 hereof) and ending upon the expiration of the Term, provided that the term of this Sublease shall terminate automatically upon the expiration of the term of the Overlease, regardless of the reason for the expiration of the term of the Overlease. The "Premises" do not include the computer, data or telephone wiring installed by Overtenant. Overtenant and Undertenant may, but need not, reach an accord as to the use of any or all of such wiring pursuant to separate agreement.

2.     SUBORDINATION TO AND INCORPORATION OF THE OVERLEASE:

A.     Except for the amount of "Fixed Basic Rent" and "Security Deposit" shown in "Basic Lease Provisions and Definitions", paragraphs 10 and 16, respectively, of the Overlease, and except for paragraphs 8, 27, 54, and 55 of the Overlease, all of the other terms and provisions of the Overlease are incorporated in this Sublease by reference, and are made a part hereof as if herein set forth at length, except that "Overtenant" shall be substituted for "Lessor" and "Undertenant" shall be substituted for "Lessee".

B.     Undertenant assumes and shall keep, observe and perform every term, provision, covenant and condition as is to be observed or performed by Overtenant, as "Lessee", pertaining to the Premises which is required to be kept, observed and performed pursuant to the Overlease and which arises or accrues on or after the Sublease Commencement Date and during the Term, other than those terms, provisions, covenants or conditions set forth in the provisions of the Overlease which, by the express terms of paragraph 2 (A) of this Sublease are not incorporated herein.

C.     This Sublease is subject and subordinate to the Overlease and to the matters to which the Overlease is or shall be subordinate.

D.     Undertenant's rights against Overlandlord shall be no greater than those of Overtenant, as "Lessee".

E.     The time limits set forth in the Overlease for giving of notices, making demands, performance of any act, condition or covenant, or the exercise of any right, remedy or option, are changed for purposes of incorporation of this Sublease, by lengthening or shortening the same in each instance, as appropriate, so that notices may be given, demands are made, or any act, condition or covenant performed, or any right, remedy or option hereunder exercised, by Overtenant or Undertenant as the case may be (and each party covenants that it will do so), within two (2) business days prior to the expiration of the time limit, taking into account the maximum grace periods, if any, relating thereto contained in the Overlease. Each party shall promptly deliver to the other party copies of all notices, requests or demands which relate to the Premises or the use or occupancy thereof after receipt of same from the Landlord. In the case of any time limit described above which is one or two days after the giving of the notice applicable thereto, such notice shall be delivered personally.

F.  Overtenant shall have the same rights and remedies with respect to a breach of this Sublease by Undertenant as Overlandlord has with respect to a breach by Overtenant, as "Lessee", of the Over-Lease, as if the same were more fully set forth at length herein, and Overtenant shall have, with respect to Undertenant, this Sublease and the Premises, all of the rights, powers, privileges and immunities as are had by the Landlord under the Overlease.

G.  Overtenant shall not be responsible for any breach of the Overlease by the Overlandlord or any non-performance or non-compliance with any provision thereof by the Overlandlord, but Overtenant shall comply with the provisions of Article 5 hereof.

H.  In any instance where, pursuant to the terms of the Overlease, the "Lessee" thereunder requires the consent of the "Lessor" thereunder, the Undertenant shall require the consent of both the Overlandlord and Overtenant. Overtenant shall not unreasonably withhold or delay its consent to any such request. However, the refusal of Overlandlord to consent to any such request shall be a valid basis for the Overtenant to refuse to any such request as well.

3.  RENT:  Annual "Fixed Basic Rent" under this Sublease, commencing on the Sublease Commencement Date and throughout the Term, shall be $321,205.50, payable in monthly installments of $7,647.75. Notwithstanding the amount of Fixed Basic Rent payable under this Sublease being less than the amount of Fixed Basic Rent payable by Overtenant, as "Lessee", pursuant to the Overlease, and without limiting paragraph 2(A) hereof, paragraph 3 of the Overlease is incorporated herein, provided however the Fixed Basic Rent due from Undertenant hereunder shall be paid directly to Overtenant at Overtenant's address as set forth herein (and not to Overlandlord). In addition to Fixed Basic Rent as described in this paragraph 3, Undertenant shall pay all other amounts due from Overtenant, as "Lessee", pursuant to the Overlease, including without limitation pursuant to paragraphs 22, 23 and 51 thereof, which accrue on or after the Sublease Commencement Date, and shall pay any such amount directly to the Overlandlord or any third party all in accordance with the Overlease.

4.  SECURITY DEPOSIT:  Undertenant shall post an amount equal to 1 month's sublease gross rental rate as a security deposit in connection with this Sublease.

5.  OVERLANDLORD'S DUTIES:  The Overlease describes the Overlandlord's duties under the Overlease. Notwithstanding the incorporation herein of the terms of the Overlease the Overtenant is not obligated to perform any of the Overlandlord's duties under the Overlease. If the Overlandlord fails to perform its duties under the Overlease, the Undertenant may send the Overtenant a notice of such failure. Upon receipt of a written notice from the Undertenant, the Overtenant shall then notify the Overlandlord of the alleged default and demand that the Overlandlord performs its obligation. If following the making of such demand and the expiration of any applicable grace period granted to the Landlord under the Overlease, the Overlandlord shall fail to perform its obligations under the Overlease, then Undertenant shall have the right to take action in its own name. If (a) any such action against the Overlandlord in Undertenant's name is barred by reason of lack of privity, non-assignability or otherwise, and (b) the failure of Overlandlord to perform its obligations under the Overlease has a materially adverse affect upon Undertenant's use and enjoyment of the Premises, then Overtenant shall bring such action in its own name subject to: (i) Undertenant being solely responsible for the cost and expense thereof; (ii) Undertenant indemnifying and defending Overtenant as required pursuant to Article 12 hereof, and (iii) Undertenant not being in default hereunder.

6.  CONDITIONS OF PREMISES:  Overtenant shall deliver the Premises to Undertenant, and Undertenant agrees to accept the Premises, vacant, broom clean, and in its "as is" condition.

7.  ASSIGNMENT SUBLETTING AND ENCUMBRANCES:  Undertenant shall not (i) assign this Sublease (by operation of law or otherwise), (ii) sublease all or any part of the Premises, (iii) mortgage, pledge, hypothecate or otherwise encumber its interest in this Sublease or the Premises or any interest therein, or (iv) grant any concession, license or otherwise permit the Premises to be used or occupied by anyone other than Undertenant. Any assignment, sublease, mortgage, pledge, hypothecation or other encumbrance of or under this Sublease without such prior written consent shall be invalid and without force and effect.

8.  INSURANCE:  In addition to all of Undertenant's obligations to obtain and maintain insurance as incorporated herein by reference from the Overlease, in each instance where, pursuant to the terms of the Overlease, Undertenant shall name Overlandlord or Overtenant as an additional insures or loss payee, Undertenant shall name both Overlandlord and Overtenant as an additional insured or loss payee.

2

9.  DAMAGE AND EMINENT DOMAIN:  If "Lessee" is entitled to elect to terminate the Overlease pursuant to paragraph 10 thereof, Undertenant may make such election.  If Fixed Basic Rent is abated pursuant to paragraph 10 or 11 of the Overlease, Undertenant shall be entitled to a portion of such abatement equal to the total abatement times a fraction the numerator of which is Undertenant's annual Fixed Basic Rent and the denominator of which is Overtenant's then Fixed Basic Rent.  If Additions Rent is abated, Undertenant shall be the beneficiary of such abatement (since Undertenant is solely responsible for the payment of such amounts).

10.  OVERTENANT'S DUTIES:  Subject to Undertenant paying to Overtenant the Fixed Basic Rent due hereunder on a timely basis, Overtenant shall pay the Fixed Basic Rent to Overlandlord when due in accordance with the terms of the Overlease.  Overtenant shall not cause the Overlease to be terminated (although Overtenant has no intention of extending the Term pursuant to paragraph 54 of the Overlease, and Overlandlord has no duty to Undertenant to do so).  But for the payment of Fixed Basic Rent, Overtenant has no other duties to Undertenant pursuant to the Overlease, either as "Lessor" (such obligations being solely those of Overlandlord) or "Lessee" (such obligations being assumed by Undertenant).

11.  ATTORNMENT:  As set forth in paragraph 8(b)(iii) of the Overlease, and without limiting the generality of paragraph 2(A) hereof, in the event of a default by "Lessee" pursuant to the Overlease, Overlandlord may, at its option, take over all the right, title and interest of Overtenant, as sublessor, under this Sublease, and Undertenant shall, at Overlandlord's option, attorn to Overlandlord pursuant to the then executory provisions of this Sublease, except that Overlandlord shall not: (i) be liable for any previous act or omission of Overtenant under this Sublease, or (ii) be subject to any offset not expressly provided for in this Sublease which theretofore accrued to this Sublease which Overlandlord has not specifically consented to in writing, or by any previous prepayment of more than one month's rent.

12.  INDEMNIFICATION:

A.  Overtenant, Overlandlord and the employees, agents, contractors, licenses and invitees (collectively "Agents") of each (collectively "Indemnified Parties"), shall not be liable to Undertenant or its Agents, and Undertenant shall indemnify and hold harmless the Indemnified Parties and each of them, and defend each with counsel of their respective reasonable choice, from and against any and all suits, claims, demands, liability, damages, costs and expenses of every kind and nature for which the Indemnified Parties are not reimbursed by insurance, including, without limiting the generality of the foregoing, reasonable, attorneys' fees and expenses, court costs, penalties and fines, incurred in connection with or arising out of the following, to the extent not caused by the gross negligence or willful misconduct or default hereunder of the Indemnified Parties, together with the cost of enforcing this indemnity:

1.  any injury or damage to any person happening on or about the Premises, or for any injury or damage to the Premises, or to any property of Undertenant, Overtenant, Overlandlord or of any other person or entity on or about the Premises;

2.  default by Undertenant in the payment of rent, additional rent or any other default by Undertenant in the observance or performance of, or compliance with any of the terms, provisions or conditions of this Sublease, including without limitation, such matters incorporated herein by incorporation of the Overlease or relating to obtaining possession of the Premises following any default;

3.  any holdover beyond the term of this Sublease; or

4.  any acts, omissions or negligence of Undertenant or any person claiming through or under Undertenant, or the Agents of Undertenant or any such person, in or about the Premises or the building.

B.  The provisions of this Article 12 shall survive the expiration or earlier termination of this Sublease.

13.  NOTICES:  For purposes of paragraph 44 of the Overlease and any and all notices delivered pursuant to this Sublease, Overtenant's address shall be as set forth above to the attention of Mr. Howard Meister, and Undertenant's address shall be as set forth above to the attention of Mr. Jeff Bailey, with a copy of any such notice simultaneously delivered by like manner of delivery to Mr. Fred Asini.

3

14. NO REPRESENTATIONS BY OVERTENANT: The Undertenant acknowledges and agrees that in executing and delivering this Sublease, it has not relied upon any statements, representations, covenants or warranties made by Overtenant or any person acting on behalf of Overtenant other than those, if any, expressly set forth in this Sublease and on such investigations, examinations and inspections as Undertenant has chosen to make or had made.

15. ENTIRE AGREEMENT, MISCELLANEOUS.

    A.   This Sublease shall be governed by and construed in accordance with the law of the State of New Jersey without regard to the conflicts of law principles thereof.

    B.   The section headings in this Sublease are inserted only as a matter of convenience for reference and are not to be given any effect in construing this Sublease.

    C.   If any of the provisions of this Sublease or the application thereof to any person or circumstance, to any extent, shall be held to be invalid or unenforceable all other provisions of this Lease will remain in full force and effect.

    D.   All of the terms and provisions of this Sublease shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

    E.   All prior negotiations and agreements relating to this Sublease and the Premises are merged in to this Sublease. This Sublease may not be amended, modified or terminated, in whole or in part, nor may any of the provisions be waived, except by a written instrument executed by the party against whom enforcement of such amendment, modification, termination or waiver is sought.

    F.   This Sublease shall not have binding force and effect and shall not confer any rights or impose any obligations upon either party unless and until both parties have executed and delivered it. Under no circumstances shall the submission of this Sublease in draft form by or to either party be deemed to constitute an offer for the subleasing of the Subleased Premises.

    G    Overtenant makes no representations or warranties with respect to Undertenant's ability to make use of any communications wiring within the Premises. Overtenant makes no representations or warranties with respect to the condition of any communications wiring within the Premises or with respect to Undertenant's ability to connect to any communication provider(s). Undertenant acknowledges that it uses any existing communication wiring at its own expense and liability and that it has not received any representation from Overtenant in connection with wiring on the Premises.

    H    This Sublease may be signed in counterparts, each of which shall be deemed an original and all of which taken together shall constitute but one and the same agreement

16. CONSENT OF OVERLANDLORD: The parties hereto acknowledge that the Overtenant must obtain the consent of the Overlandlord in order to sublease the Premises to the Undertenant pursuant to this Sublease. Undertenant acknowledges that this Sublease is subject to the rights of Overlandlord pursuant to paragraph 8(a) of the Overlease. Promptly after receipt of a fully executed Sublease Overtenant shall submit same to Overlandlord and request consent hereto, and pay the required $500 fee. Overtenant shall provide Undertenant a copy of such submission. Overtenant and Undertenant shall each submit to Overlandlord any documentation or other information reasonably requested by Overlandlord so as to cause Overlandlord to consent to this Sublease. If the Overlandlord's consent to this Sublease is not granted or denied within forty five (45) days of the submission of same to Overlandlord either Overtenant or Undertenant may terminate this Sublease at any time prior to the receipt of such consent, in which event this Sublease will be void and of no force and effect. If Overlandlord does consent to this Sublease prior to its properly being terminated pursuant to this Article 16 Overtenant shall provide notice of receipt of such consent to Undertenant and the "Sublease Commencement Date" shall be the third business day following delivery of such notice to Undertenant. To the extent the Sublease Commencement Date is more than thirty (30) days prior to September 15, 2005, Overtenant will permit Undertenant to have early access to the Premises for a period of up to thirty (30) days. In the event the Sublease Commencement Date is less than thirty days prior to September 15, 2005, Overtenant will provide to Undertenant as much early access as possible during the period subsequent to Overlandlord providing its consent and September 15, 2005.

4

IN WITNESS WHEREOF the parties have executed and delivered this Sublease Agreement as of the day and year first written above.

OVERTENANT:           Magnell Associate, Inc., d/b/a ABS Computer
Technologies, Inc.

By: _____

Name: HOWARD R MEISTER

Title: Logistics Mgr.

UNDERTENANT:        Franklin First Financial, Ltd.

By: _____

Name: Fred Assini

Title:   President

5

#790698 v1
104274-50554

**LEASE**

**from:**

**600 PARSIPPANY ASSOCIATES L.L.C.**

**Lessor**

**to:**

**MAGNELL ASSOCIATES, INC. d/b/a ABS COMPUTER TECHNOLOGIES, INC.**

**Lessee**

**Building:**
**600 Parsippany Road**
**Parsippany, New Jersey**

## TABLE OF CONTENTS

1.  DESCRIPTION: ........................................................................................................................ 3

2.  TERM: .................................................................................................................................... 3

3.  BASIC RENT: ......................................................................................................................... 3

4.  USE AND OCCUPANCY: ....................................................................................................... 3

5.  CARE AND REPAIR OF PREMISES/ENVIRONMENTAL: ................................................. 3

6.  ALTERATIONS, ADDITIONS OR IMPROVEMENTS: .......................................................... 5

7.  ACTIVITIES INCREASING FIRE INSURANCE RATES: ..................................................... 6

8.  ASSIGNMENT AND SUBLEASE: ......................................................................................... 6

9.  COMPLIANCE WITH RULES AND REGULATIONS: ......................................................... 9

10. DAMAGES TO BUILDING: ................................................................................................. 10

11. EMINENT DOMAIN: ........................................................................................................... 10

12. INSOLVENCY OF LESSEE: ................................................................................................. 10

13. LESSOR'S REMEDIES ON DEFAULT: ............................................................................... 11

14. DEFICIENCY: ....................................................................................................................... 11

15. SUBORDINATION OF LEASE: ............................................................................................ 12

16. SECURITY DEPOSIT: .......................................................................................................... 12

17. RIGHT TO CURE LESSEE'S BREACH: ............................................................................. 13

18. MECHANIC'S LIENS: .......................................................................................................... 13

19. RIGHT TO INSPECT AND REPAIR: .................................................................................. 13

20. SERVICES TO BE PROVIDED BY LESSOR/LESSOR'S EXCULPATION: ........................ 13

21. INTERRUPTION OF SERVICES OR USE: ......................................................................... 14

22. BUILDING STANDARD OFFICE ELECTRICAL SERVICE: ............................................. 14

23. ADDITIONAL RENT: ........................................................................................................... 15

24. LESSEE'S ESTOPPEL: ........................................................................................................ 19

25. HOLDOVER TENANCY: ....................................................................................................... 19

26. RIGHT TO SHOW PREMISES: ........................................................................................... 20

27. LESSOR'S WORK – LESSEE'S DRAWINGS: ..................................................................... 20

28. WAIVER OF TRIAL BY JURY: ............................................................................................ 20

29. LATE CHARGE: .................................................................................................................... 20

30. LESSEE'S INSURANCE: ...................................................................................................... 20

31. NO OTHER REPRESENTATIONS: ...................................................................................... 22

32. QUIET ENJOYMENT: ........................................................................................................... 22

33. INDEMNITY: ........................................................................................................................ 22

34. ARTICLE HEADINGS: ......................................................................................................... 23

35. APPLICABILITY TO HEIRS AND ASSIGNS: .................................................................... 23

36. OUTSIDE PARKING SPACES: ............................................................................................ 23

37. LESSOR'S LIABILITY FOR LOSS OF PROPERTY: ............................................. 23

38. PARTIAL INVALIDITY: ....................................................................................... 23

39. LESSEE'S BROKER: ............................................................................................ 24

40. PERSONAL LIABILITY: ...................................................................................... 24

41. NO OPTION: ......................................................................................................... 24

42. DEFINITIONS: ...................................................................................................... 24

43. LEASE COMMENCEMENT: ............................................................................... 25

44. NOTICES: .............................................................................................................. 25

45. ACCORD AND SATISFACTION: ........................................................................ 26

46. EFFECT OF WAIVERS: ....................................................................................... 26

47. LEASE CONDITION: ........................................................................................... 26

48. MORTGAGEE'S NOTICE AND OPPORTUNITY TO CURE: ............................ 26

49. LESSOR'S RESERVED RIGHT: .......................................................................... 26

50. CORPORATE AUTHORITY: ............................................................................... 26

51. AFTER-HOURS USE: ........................................................................................... 27

52. LESSEE'S EXPANSION/RELOCATION: ............................................................ 27

53. BUILDING PERMIT: ............................................................................................ 28

54. OPTION TO RENEW: ........................................................................................... 28

55. TERMINATION OPTION: .................................................................................... 30

LEASE, is made the _21st_ day of _November_, 2003 between 600 PARSIPPANY ASSOCIATES L.L.C. (herein referred to as "Lessor") whose address is c/o Mack-Cali Realty Corporation, 11 Commerce Drive, Cranford, New Jersey 07016 and MAGNELL ASSOCIATES, INC. d/b/a ABS COMPUTER TECHNOLOGIES, INC. (herein referred to as "Lessee") whose address is 9997 East Rose Hills Road, Whittier, CA 90601.

## PREAMBLE

### BASIC LEASE PROVISIONS AND DEFINITIONS

In addition to other terms elsewhere defined in this Lease, the following terms whenever used in this Lease shall have only the meanings set forth in this section, unless such meanings are expressly modified, limited or expanded elsewhere herein.

1.  **ADDITIONAL RENT** shall mean all sums in addition to Fixed Basic Rent payable by Lessee to Lessor pursuant to the provisions of the Lease.

2.  **BASE PERIOD COSTS** shall mean the following:

    A.  Base Operating Costs: Those Operating Costs incurred during Calendar Year 2004.

    B.  Base Real Estate Taxes: Those Real Estate Taxes incurred during Calendar Year 2004.

    C.  Insurance Cost Expense Stop: $14,400.00

    D.  Utility and Energy Costs Expense Stop: $96,000.00

3.  **BUILDING** shall mean 600 Parsippany Road, Parsippany, New Jersey.

4.  **BUILDING HOLIDAYS** shall be those shown on Exhibit E.

5.  **BUILDING HOURS** shall be Monday through Friday, 8:00 a.m. to 6:00 p.m., but excluding those holidays as set forth on Exhibit F attached hereto and made a part hereof, except that Common Facilities, lighting in the Building and Office Building Area shall be maintained for such additional hours as, in Lessor's sole judgment, is necessary or desirable to insure proper operating of the Building and Office Building Area.

6.  **COMMENCEMENT DATE** is December 8, 2003 and shall for purposes hereof be subject to Articles 27 and 43 hereof.

7.  **DEMISED PREMISES OR PREMISES** shall be deemed to be 5,562 gross rentable square feet as shown on Exhibit A hereto, which includes an allocable share of the Common Facilities as defined in Article 42(b).

8.  **EXHIBITS** shall be the following, attached to this Lease and incorporated herein and made a part hereof.

    | | |
    |---|---|
    | Exhibit A | Location of Premises |
    | Exhibit A-1 | Office Building Area |
    | Exhibit B | Rules and Regulations |
    | Exhibit C | Lessor's Work |
    | Exhibit C-1 | Air Conditioning & Heating Design Standards |
    | Exhibit D | Cleaning Services |
    | Exhibit E | Building Holidays |
    | Exhibit F | Tenant Estoppel Certificate |
    | Exhibit G | Commencement Date Agreement |

9.  **EXPIRATION DATE** shall be February 28, 2009.

10.   **FIXED BASIC RENT** shall mean: FIVE HUNDRED FIFTY THOUSAND SIX HUNDRED THIRTY-EIGHT AND 00/100 ($550,638.00) for the Term payable as follows:

| Period | Yearly Rate | Monthly Installment |
|---|---|---|
| 12/8/03-2/29/04 | $0.00 | $0.00 |
| 3/1/04-2/28/06 | $105,678.00 | $8,806.50 |
| 3/1/06-2/29/08 | $111,240.00 | $9,270.00 |
| 3/1/08-2/28/09 | $116,802.00 | $9,733.50 |

11.   **LESSEE'S BROKER** shall mean Newmark Real Estate of New Jersey.

12.   **LESSEE'S PERCENTAGE** shall be 5.80% subject to adjustment as provided for in Article 42(d).

13.   **OFFICE BUILDING AREA** is as set forth on Exhibit A-1.

14.   **PARKING SPACES** shall mean a total of twenty-two (22) unassigned spaces.

15.   **PERMITTED USE** shall be general office use and for no other purpose.

16.   **SECURITY DEPOSIT** shall be NINE THOUSAND ONE HUNDRED SEVENTY-SEVEN AND 30/100 DOLLARS ($9,177.30).

17.   **TERM** shall mean the period commencing on the Commencement Date through and including the Expiration Date, unless extended pursuant to any option contained herein.


-- End of Preamble --

## W I T N E S S E T H

For and in consideration of the covenants herein contained, and upon the terms and conditions herein set forth, Lessor and Lessee agree as follows:

1. **DESCRIPTION:**

   Lessor hereby leases to Lessee, and Lessee hereby hires from Lessor, the Premises as defined in the Preamble which includes an allocable share of the Common Facilities, as shown on the plan or plans, initialed by the parties hereto, marked Exhibit A attached hereto and made part of this Lease in the Building as defined in the Preamble, (hereinafter called the "Building") which is situated on that certain parcel of land (hereinafter called "Office Building Area") as described on Exhibit A-1 attached hereto and made part of this Lease, together, with the right to use in common with other lessees of the Building, their invitees, customers and employees, those public areas of the Common Facilities as hereinafter defined.

2. **TERM:**

   The Premises are leased for a term to commence on the Commencement Date, and to end at 12:00 midnight on the Expiration Date, all as defined in the Preamble.

3. **BASIC RENT:**

   The Lessee shall pay to the Lessor during the Term, the Fixed Basic Rent as defined in the Preamble (hereinafter called "Fixed Basic Rent") payable in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts. The Fixed Basic Rent shall accrue at the Yearly Rate as defined in the Preamble and shall be payable, in advance, on the first day of each calendar month during the Term at the Monthly Installments as defined in the Preamble, except that a proportionately lesser sum may be paid for the first and last months of the Term of this Lease if the Term commences on a day other than the first day of the month, in accordance with the provisions of this Lease herein set forth. Lessor acknowledges receipt from Lessee of the first monthly installment by check, subject to collection, for Fixed Basic Rent for the first month of the Lease Term. Lessee shall pay Fixed Basic Rent, and any Additional Rent as hereinafter provided, to Lessor at Lessor's above stated address, or at such other place as Lessor may designate in writing, without demand and without counterclaim, deduction or set off.

4. **USE AND OCCUPANCY:**

   Lessee shall use and occupy the Premises for the Permitted Use as defined in the Preamble.

   Lessee hereby acknowledges "no smoking" is permitted in the Common Facilities. If at any time during the Term of this Lease, Lessee adopts a policy prohibiting Lessee, its employees, agents or invitees from smoking within the Premises, Lessee shall use its best efforts to enforce Lessor's policy prohibiting its employees, agents or invitees from smoking within the Common Facilities including the areas outside of the Building's main entrance.

5. **CARE AND REPAIR OF PREMISES/ENVIRONMENTAL:**

   (a)   Lessee shall commit no act of waste and shall take good care of the Premises and the fixtures and appurtenances therein, and shall, in the use and occupancy of the Premises, conform its actions to all laws, orders and regulations of the federal, state and municipal governments or any of their departments affecting the Premises and with any and all environmental requirements resulting from the Lessee's use of the Premises (collectively, "Laws"), this covenant to survive the expiration or sooner termination of the Lease, provided, however, Lessee shall have no obligation to make any structural alteration to the Premises so as to be in compliance with Laws, except

where such compliance is made necessary by reason of Lessee's particular use or manner of use of the Premises. Lessor shall, subject to the same being included in Operating Costs, make all necessary repairs to the Premises, Common Facilities and to the assigned parking areas, if any, including without limitation care of landscaped areas and prompt removal of snow and ice, and shall cause same to be in compliance with Laws, including, without limitation, Environmental Laws (as defined in paragraph 5(b)), except where the repair has been made necessary by misuse or neglect by Lessee or Lessee's agents, servants, visitors or licensees, or by reason of Lessee's particular use or manner of use of the Premises in which event Lessor shall nevertheless make the repair but Lessee shall pay to Lessor, as Additional Rent, immediately upon demand, the costs therefor. All improvements made by Lessee to the Premises, which are so attached to the Premises, shall become the property of Lessor upon installation. Not later than the last day of the Term, Lessee shall, at Lessee's expense, remove all Lessee's personal property and those improvements made by Lessee which have not become the property of Lessor, including trade fixtures, cabinetwork, movable paneling, partitions and the like; repair all injury done by or in connection with the installation or removal of said property and improvements; and surrender the Premises in as good condition as they were at the beginning of the Term, reasonable wear and tear and damage by fire, the elements, casualty or other cause not due to the misuse or neglect by Lessee, Lessee's agents, servants, visitors or licensees excepted. All other property of Lessee remaining on the Premises after the last day of the Term of this Lease shall be conclusively deemed abandoned and may be removed by Lessor, and Lessee shall reimburse Lessor for the cost of such removal. Lessor may have any such property stored at Lessee's risk and expense.

## ENVIRONMENTAL

(b) **Compliance with Environmental Laws**. Lessee shall, at Lessee's own expense, promptly comply with each and every federal, state, county and municipal environmental law, ordinance, rule, regulation, order, directive and requirement, now or hereafter existing ("Environmental Laws"), applicable to the Premises, Lessee, Lessee's operations at the Premises, or all of them, provided, however, Lessee shall have no responsibility for causing the Premises to be in compliance with any Environmental Law, to the extent the Premises were not in compliance with same on the Commencement Date, and provided further Lessee shall have no obligation to make any alteration to the Premises so as to be in compliance with Laws, except where such compliance is made necessary by reason of Lessee's particular use or manner of use of the Premises.

(c) **ISRA Compliance**. Lessee shall, at Lessee's own expense, comply with the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq., the regulations promulgated thereunder and any amending and successor legislation and regulations ("ISRA").

(d) **Information to Lessor**. At no expense to Lessor, Lessee shall promptly provide all information and sign all documents reasonably requested by Lessor with respect to compliance with Environmental Laws.

(e) **Lessor Audit**. Lessee shall permit Lessor and its representatives access to the Premises, from time to time, to conduct an environmental assessment, investigation and sampling, all at Lessor's own expense. If such assessment, investigation and sampling reveal a violation of this provision, the cost shall be borne by Lessee.

(f) **Lessee Remediation**. Should any assessment, investigation or sampling reveal the existence of any spill, discharge or placement of Contaminants in, on, under, or about, or migrating from or onto the Premises, the Building or the Office Building Area, as the proximate result of the action or omission of Lessee or a "Lessee Representative", then, in addition to being in default under this Lease and Lessor having all rights available to Lessor under this Lease and by law by reason of such default, Lessee shall, at Lessee's own expense, in accordance with Environmental Laws, undertake all action required by any governmental authority, including, without limitation, promptly obtaining and delivering to Lessor, to the extent required, an unconditional No Further Action Letter. For purposes of this Article, the term "Lessee's Representative" shall mean any shareholder, officer, director,

member, partner, employee, agent, licensee, assignee, sublessee or invitee of Lessee, or any third party other than Lessor, or another lessee of the Building, or a shareholder, officer, director, member, partner, employee, agent, licensee, assignee, sublessee or invitee of such other lessee. In no event shall any of Lessee's remedial action involve engineering or institutional controls, a groundwater classification exception area or well restriction area, and Lessee's remedial action shall meet the most stringent published or unpublished remediation standards for soil, surface water, groundwater and drinking water. Promptly upon completion of all required investigatory and remedial activities, Lessee shall, at Lessee's own expense, restore to the condition existing prior to the investigatory or remedial work the affected areas of the Premises, the Building or the Office Building Area, as the case may be, from any damage or condition caused by the investigatory or remedial work.

(g) **Environmental Questionnaire**. Upon Lessor's request, contemporaneously with the signing and delivery of this Lease, and thereafter upon renewal of the Lease, if at all, Lessee shall complete, execute and deliver to Lessor an environmental questionnaire in form and substance satisfactory to Lessor in Lessor's reasonable judgment.

(h) **Environmental Documents and Conditions**. For purposes of this Article, the term "Environmental Documents" shall mean all environmental documentation concerning the Building or the Office Building Area, of which the Premises is a part, or its environs, in the possession or under the control of Lessee, including, without limitation, plans, reports, correspondence and submissions. During the term of this Lease and subsequently, promptly upon receipt by Lessee or Lessee's Representatives, Lessee shall deliver to Lessor all Environmental Documents concerning or generated by or on behalf of Lessee, whether currently or hereafter existing. In addition, Lessee shall promptly notify Lessor of any environmental condition of which Lessee has knowledge, which may exist in, on, under, or about, or may be migrating from or onto the Building or the Office Building Area.

(i) **Lessor's Right to Perform Lessee's Obligations**. Notwithstanding anything to the contrary set forth in this Lease, in the event, pursuant to this Lease, Lessee is required to undertake any sampling, assessment, investigation or remediation with respect to the Premises, the Building or the Office Building Area, as the case may be, then, at Lessor's discretion, Lessor shall have the right, upon notice to Lessee, from time to time, to perform such activities at Lessee's expense, and all sums incurred by Lessor shall be paid by Lessee, as Additional Rent, upon demand.

(j) **Indemnity**. Lessee shall indemnify, defend and hold harmless Lessor, Lessor's officers, directors, shareholders, employees and personal or legal representatives from and against any and all claims, liabilities, losses, damages, penalties and costs, foreseen or unforeseen, including, without limitation, counsel, engineering and other professional or expert fees, which an indemnified party may incur resulting directly or indirectly, wholly or partly from Lessee's actions or omissions with regard to Lessee's obligations under this Article.

(k) **Survival**. This Article shall survive the expiration or earlier termination of this lease. Lessee's failure to abide by the terms of this Article shall be restrainable or enforceable, as the case may be, by injunction.

(l) **Interpretation**. The obligations imposed upon Lessee under subparagraphs (a) through (j) above are in addition to and are not intended to limit, but to expand upon, the obligations imposed upon Lessee under this Article 5. As used in this Article, the term "Contaminants" shall include, without limitation, any regulated substance, toxic substance, hazardous substance, hazardous waste, pollution, pollutant, contaminant, petroleum, asbestos or polychlorinated biphenyls, as defined or referred to in any Environmental Laws. Where a law or regulation defines any of these terms more broadly than another, the broader definition shall apply.

6. **ALTERATIONS, ADDITIONS OR IMPROVEMENTS:**

Lessee shall not, without first obtaining the written consent of Lessor, make any structural

or Building Systems alterations, additions or improvements in, to or about the Premises. Building Systems shall mean any structural, life safety, plumbing, electrical, heating, ventilation or air conditioning system or its components. Lessee shall not, without first obtaining the written consent of Lessor (which shall not be unreasonably withheld or delayed) make any non-Building Systems alterations, additions or improvements in, to or about the Premises. Lessee may, upon notification to Lessor, perform minor cosmetic improvements, such as painting and wallpapering, without prior consent of Lessor.

7.   **ACTIVITIES INCREASING FIRE INSURANCE RATES:**

Lessee shall not do or suffer anything to be done on the Premises which will increase the rate of fire insurance on the Building.

8.   **ASSIGNMENT AND SUBLEASE:**

Provided Lessee is not in default of any provisions of this Lease, Lessee may assign or sublease the within Lease to any party subject to the following:

a.   In the event Lessee desires to assign this Lease or sublease all or part of the Premises to any other party, the terms and conditions of such assignment or sublease shall be communicated to the Lessor in writing no less than thirty (30) days prior to the effective date of any such sublease or assignment, and, prior to such effective date, the Lessor shall have the option, exercisable in writing to the Lessee, to: (i) sublease such space from Lessee at the lower rate of (a) the rental rate per rentable square foot of Fixed Basic Rent and Additional Rent then payable pursuant to this Lease or (b) the terms set forth in the proposed sublease, (ii) recapture in the case of subletting, that portion of the Premises to be sublet or all of the Premises in the case of an assignment ("Recapture Space") so that such prospective sublessee or assignee shall then become the sole lessee of Lessor hereunder, or (iii) recapture the Recapture Space for Lessor's own use, and in either of such events set forth in clauses (ii) and (iii) above, the within Lessee shall be fully released from any and all obligations hereunder with respect to the Recapture Space.

b.   In the event that the Lessor elects not to recapture the Lease or relet the Premises as hereinabove provided, the Lessee may nevertheless assign this Lease or sublet the whole or any portion of the Premises, subject to the Lessor's prior written consent, which consent shall not be unreasonably withheld or delayed, on the basis of the following terms and conditions:

   i.   The Lessee shall provide to the Lessor the name and address of the assignee or sublessee.

   ii.   The assignee shall assume, by written instrument, all of the obligations of this Lease, or the sublessee shall assume by written instrument such obligations as are relevant to the subleased premises and accrue during the subleased term, and a copy of such assumption agreement shall be furnished to the Lessor within ten (10) days of its execution. Any sublease shall expressly acknowledge that said sublessee's rights against Lessor shall be no greater than those of Lessee. Lessee further agrees that notwithstanding any such subletting, no other and further subletting of the Premises by Lessee or any person claiming through or under Lessee shall or will be made except upon compliance with and subject to the provisions of this Article 8.

   iii.   Each sublease shall provide that it is subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and that in the event of default by Lessee under this Lease, Lessor may, at its option, take over all of the right, title and interest of Lessee, as sublessor, under such sublease, and such sublessee shall, at Lessor's option, attorn to Lessor pursuant to the then executory provisions of such sublease, except that Lessor shall not (i) be liable for any previous act or omission of Lessee under such sublease or, (ii) be subject to any offset not expressly provided in such sublease which theretofore accrued to such sublease to which Lessor has not specifically consented in writing or by any previous prepayment of more than

one month's rent.

iv.     The Lessee and each assignee shall be and remain liable for the observance of all the covenants and provisions of this Lease, including, but not limited to, the payment of Fixed Basic Rent and Additional Rent reserved herein, through the entire Term of this Lease, as the same may be renewed, extended or otherwise modified.

v.      The Lessee and any assignee shall promptly pay to Lessor fifty percent (50%) of any consideration received for any assignment after the payment of all actual and reasonable expenses associated with the assignment including, without limitation, brokerage and legal fees, and/or fifty percent (50%) of all of the rent, as and when received, to the extent such rent is in excess of the Rent required to be paid by Lessee for the area sublet and the sum of all actual and reasonable expenses associated with the subletting computed on the basis of an average square foot rent for the gross square footage Lessee has leased, with said expenses being amortized over the initial fixed term of the sublease.

vi.     In any event, the acceptance by the Lessor of any rent from the assignee or from any of the subtenants or the failure of the Lessor to insist upon a strict performance of any of the terms, conditions and covenants herein shall not release the Lessee herein, nor any assignee assuming this Lease, from any and all of the obligations herein during and for the entire Term of this Lease.

vii.    In Lessor's reasonable judgment, the proposed assignee or subtenant is engaged in a business or activity, and the Premises, or the relevant part thereof, will be used in a manner, which (a) is in keeping with the then standard of the Building and (b) is limited to the use of the Premises as general offices.

viii.   The proposed assignee or subtenant shall be an entity which has existed for at least one (1) year and is not then an occupant of any part of the Building or any other building then owned by Lessor or its affiliates within a five-mile radius of the Building.

ix.     The proposed assignee or subtenant is not an entity or a person with whom Lessor is or has been, within the preceding twelve (12) month period, negotiating to lease space in the Building or any other building owned by Lessor or its affiliates within a five-mile radius of the Building.

x.      There shall not be more than one (1) subtenant in the Premises.

xi.     Lessee shall not advertise the subtenancy for less than the then current market rent per rentable square foot for the Premises as though the Premises were vacant.

xii.    Lessee shall not list the Premises for subletting or assignment with other than a broker, agent or representative who waives any entitlement to a commission or other fee from Lessor in the event of a recapturing of the Premises;

xiii.   Intentionally omitted.

xiv.    The proposed assignee or subtenant shall only use the Premises for general offices and shall not be engaged in any of the following:

        (a)     educational, including but not limited to, instructional facilities and correspondence schools;
        (b)     employment agencies;
        (c)     model agencies;
        (d)     photographic studios or laboratories;
        (e)     spas, health, physical fitness or exercise salons;
        (f)     small loan offices;
        (g)     real estate brokerage or real estate sales offices open to the general

7

|      |     | public or construction offices;                                             |
| (h)  |     | medical or dental facilities, including professional offices, treatment facilities, dispensaries or laboratories; |
| (i)  |     | federal, state or local government offices;                                 |
| (j)  |     | so-called boiler room operations;                                           |
| (k)  |     | retail stock brokerage offices; and                                        |
| (l)  |     | religious organizations making facilities available to congregations for uses other than business purposes; and |
| (m)  |     | executive office suite use, i.e., the business of affording relatively short term office space to a transient population of subtenants. |

xv.   The proposed assignee or subtenant shall not be entitled, directly or indirectly, to diplomatic or sovereign immunity and shall be subject to the service of process in, and the jurisdiction of, the state courts of New Jersey.

xvi.  Lessor shall require a FIVE HUNDRED AND 00/100 DOLLAR ($500.00) payment to cover its handling charges for each request for consent to any sublet or assignment prior to its consideration of the same. Lessee acknowledges that its sole remedy with respect to any assertion that Lessor's failure to consent to any sublet or assignment is unreasonable shall be the remedy of specific performance and Lessee shall have no other claim or cause of action against Lessor as a result of Lessor's actions in refusing to consent thereto.

c.    If Lessee is a corporation other than a corporation whose stock is listed and traded on a nationally recognized stock exchange, the provisions of Sub-section a. shall apply to a transfer (however accomplished, whether in a single transaction or in a series of related or unrelated transactions) of stock (or any other mechanism such as, by way of example, the issuance of additional stock, a stock voting agreement or change in class(es) of stock) which results in a change of control of Lessee as if such transfer of stock (or other mechanism) which results in a change of control of Lessee were an assignment of this Lease, and if Lessee is a partnership or joint venture, said provisions shall apply with respect to a transfer (by one or more transfers) of an interest in the distributions of profits and losses of such partnership or joint venture (or other mechanism, such as, by way of example, the creation of additional general partnership or limited partnership interests) which results in a change of control of such a partnership or joint venture, as if such transfer of an interest in the distributions of profits and losses of such partnership or joint venture which results in a change of control of such partnership or joint venture were an assignment of this Lease; but said provisions shall not apply and Lessor's consent shall not be required with respect to transactions with a corporation into or with which Lessee is merged or consolidated, or the issuance of shares of Lessee pursuant to an IPO, even if otherwise constituting a change of control as described herein, or to which all or substantially all of Lessee's assets are transferred or to any corporation which controls or is controlled by Lessee or is under common control with Lessee, provided that in the event of such merger, consolidation or transfer of all or substantially all of Lessee's assets (i) the successor to Lessee has a net worth computed in accordance with generally accepted accounting principles at least equal to the net worth of Lessee immediately prior to such merger, consolidation or transfer and (ii) proof satisfactory to Lessor of such net worth shall have been delivered to Lessor at least 10 days prior to the effective date of any such transaction.

Without Lessor's consent, Lessee may assign this Lease or sublet any portion of all the Premises to any corporation, partnership, trust, association or other business organization directly or indirectly controlling or controlled by Lessee or under common control with Lessee, or to any successor by merger, consolidation, corporate reorganization or acquisition of all or substantially all of the assets of Lessee provided that any such successor by merger, consolidation, corporate reorganization or acquisition of assets has a net worth at the time of such merger, consolidation, reorganization or acquisition (herein, "Merger") equal to or greater than the net worth of Lessee immediately preceding the Merger.  Any other assignment or subleasing of Lessee's interest under this Lease shall be subject to Lessor's approval, which approval shall not be unreasonably withheld or delayed. The provisions of subparagraphs a. and b. of this Article 8, except for subsections i., ii., iii., iv., vi., vii

and xv of subparagraph b., shall not apply to any transaction under this subparagraph c. for which Lessor's consent is not required.

d.  In the event that any or all of Lessee's interest in the Premises and/or this Lease is transferred by operation of law to any trustee, receiver, or other representative or agent of Lessee, or to Lessee as a debtor in possession, and subsequently any or all of Lessee's interest in the Premises and/or this Lease is offered or to be offered by Lessee or any trustee, receiver, or other representative or agent of Lessee as to its estate or property (such person, firm or entity being hereinafter referred to as the "Grantor"), for assignment, conveyance, lease, or other disposition to a person, firm or entity other than Lessor (each such transaction being hereinafter referred to as a "Disposition"), it is agreed that Lessor has and shall have a right of first refusal to purchase, take, or otherwise acquire, the same upon the same terms and conditions as the Grantor thereof shall accept upon such Disposition to such other person, firm, or entity; and as to each such Disposition the Grantor shall give written notice to Lessor in reasonable detail of all of the terms and conditions of such Disposition within twenty (20) days next following its determination to accept the same but prior to accepting the same, and Grantor shall not make the Disposition until and unless Lessor has failed or refused to accept such right of first refusal as to the Disposition, as set forth herein.

Lessor shall have thirty (30) days next following its receipt of the written notice as to such Disposition in which to exercise the option to acquire Lessee's interest by such Disposition, and the exercise of the option by Lessor shall be effected by notice to that effect sent to the Grantor; but nothing herein shall require Lessor to accept a particular Disposition or any Disposition, nor does the rejection of any one such offer of first refusal constitute a waiver or release of the obligation of the Grantor to submit other offers hereunder to Lessor. In the event Lessor accept such offer of first refusal, the transaction shall be consummated pursuant to the terms and conditions of the Disposition described in the notice to Lessor. In the event Lessor rejects such offer of first refusal, Grantor may consummate the Disposition with such other person, firm, or entity; but any decrease in price of more than five percent (5%) of the price sought from Lessor or any material change in the terms of payment for such Disposition shall constitute a new transaction requiring a further option of first refusal to be given to Lessor hereunder.

e.  Without limiting any of the provisions of Articles 12 and 13, if pursuant to the Federal Bankruptcy Code (herein referred to as the "Code"), or any similar law hereafter enacted having the same general purpose, Lessee is permitted to assign this Lease notwithstanding the restrictions contained in this Lease, adequate assurance of future performance by an assignee expressly permitted under such Code shall be deemed to mean the deposit of cash security in an amount equal to the sum of one year's Fixed Basic Rent plus an amount equal to the Additional Rent for the calendar year preceding the year in which such assignment is intended to become effective, which deposit shall be held by Lessor for the balance of the Term, without interest, as security for the full performance of all of Lessee's obligations under this Lease, to be held and applied in the manner specified for security in Article 16.

f.  Except as specifically set forth above, no portion of the Premises or of Lessee's interest in this Lease may be acquired by any other person or entity, whether by assignment, mortgage, sublease, transfer, operation of law or act of the Lessee, nor shall Lessee pledge its interest in this Lease or in any security deposit required hereunder.

9.  **COMPLIANCE WITH RULES AND REGULATIONS:**

Lessee shall observe and comply with the rules and regulations hereinafter set forth in Exhibit B attached hereto and made a part hereof and with such further reasonable building-wide rules and regulations as Lessor may prescribe, on written notice to the Lessee, for the safety, care and cleanliness of the Building and the comfort, quiet and convenience of other occupants of the Building. Lessee shall not place a load upon any floor of the Premises exceeding the floor load per square foot area which it was designed to carry and which is allowed by law. Lessor reserves the right to prescribe the weight and position of all safes,

business machines and mechanical equipment. Such installations shall be placed and maintained by Lessee, at Lessee's expense, in settings sufficient, in Lessor's judgement, to absorb and prevent vibration, noise and annoyance.

### 10. DAMAGES TO BUILDING:

If the Building is damaged by fire or any other cause to such extent the cost of restoration, as reasonably estimated by Lessor, will equal or exceed twenty-five percent (25%) of the replacement value of the Building (exclusive of foundations) just prior to the occurrence of the damage, then Lessor may, no later than the sixtieth (60th) day following the date of damage, give Lessee a notice of election to terminate this Lease, or if the cost of restoration will equal or exceed fifty percent (50%) of such replacement value and if the Premises shall not be reasonably usable for the purpose for which they are leased hereunder or if restoration of the damage will require more than one hundred eighty (180) days to complete or if such damage is not fully repaired and reasonable access to the Premises restored within one hundred eighty (180) days from the date of damage, then, in any such event, Lessee may, no later than the sixtieth (60th) day following the date of damage or following the end of said one hundred eighty (180) day period, give Lessor a notice of election to terminate this Lease. In either said event of election, this Lease shall be deemed to terminate on the thirtieth (30th) day after the giving of said notice, and Lessee shall surrender possession of the Premises within a reasonable time thereafter, and the Fixed Basic Rent, and any Additional Rent, shall be apportioned as of the date of said surrender and any Fixed Basic Rent or Additional Rent paid for any period beyond said date shall be repaid to Lessee. If the cost of restoration shall not entitle Lessor to terminate this Lease, or if, despite the cost, Lessor does not elect to terminate this Lease, Lessor shall restore the Building and the Premises with reasonable promptness, subject to Force Majeure, and Lessee shall have no right to terminate this Lease, except as set forth above. Lessor need not restore fixtures and improvements owned by Lessee.

In any case in which use of the Premises is affected by any damage to the Building, there shall be either an abatement or an equitable reduction in Fixed Basic Rent, depending on the period for which and the extent to which the Premises are not reasonably usable for the purpose for which they are leased hereunder. The words "restoration" and "restore" as used in this Article 10 shall include repairs. If the damage results from the fault of the Lessee, Lessee's agents, servants, visitors or licensees, Lessee shall not be entitled to any abatement or reduction in Fixed Basic Rent, except to the extent of any rent insurance received by Lessor.

### 11. EMINENT DOMAIN:

If Lessee's use of the Premises is materially affected due to the taking by eminent domain of (a) the Premises or any part thereof or any estate therein; or (b) any other part of the Building; then, in either event, this Lease shall terminate on the date when title vests pursuant to such taking. The Fixed Basic Rent, and any Additional Rent, shall be apportioned as of said termination date and any Fixed Basic Rent or Additional Rent paid for any period beyond said date, shall be repaid to Lessee. Lessee shall not be entitled to any part of the award for such taking or any payment in lieu thereof, but Lessee may file a separate claim for any taking of fixtures and improvements owned by Lessee which have not become the Lessor's property, and for moving expenses, provided the same shall, in no way, affect or diminish Lessor's award. In the event of a partial taking which does not effect a termination of this Lease but does deprive Lessee of the use of a portion of the Premises, there shall either be an abatement or an equitable reduction of the Fixed Basic Rent, and an equitable adjustment reducing the Base Period Costs as hereinafter defined depending on the period for which and the extent to which the Premises so taken are not reasonably usable for the purpose for which they are leased hereunder.

### 12. INSOLVENCY OF LESSEE:

Either (a) the appointment of a receiver to take possession of all or substantially all of the assets of Lessee, or, (b) a general assignment by Lessee for the benefit of creditors, or, (c) any action taken or suffered by Lessee under any insolvency or bankruptcy act, shall

constitute a default of this Lease by Lessee, and Lessor may terminate this Lease forthwith and upon notice of such termination Lessee's right to possession of the Premises shall cease, and Lessee shall then quit and surrender the Premises to Lessor but Lessee shall remain liable as hereinafter provided in Article 14 hereof. Notwithstanding the prior sentence, if any of the described events were not voluntarily undertaken by Lessee, Lessee shall have ninety (90) days to cause the relevant event to be reversed or otherwise set aside or rendered meaningless prior to Lessor being entitled to terminate this Lease.

13.   **LESSOR'S REMEDIES ON DEFAULT:**

If Lessee defaults in the payment of Fixed Basic Rent, or any Additional Rent, or defaults in the performance of any of the other covenants and conditions hereof or permits the Premises to become deserted, abandoned or vacated, Lessor may give Lessee notice of such default, and if Lessee does not cure any Fixed Basic Rent or Additional Rent default within five (5) days or other default within fifteen (15) days after giving of such notice (or if such other default is of such nature that it cannot be completely cured within such period, if Lessee does not commence such curing within such fifteen (15) days and thereafter proceed with reasonable diligence and in good faith to cure such default), then Lessor may terminate this Lease on not less than ten (10) days notice to Lessee, and on the date specified in said notice, Lessee's right to possession of the Premises shall cease but Lessee shall remain liable as hereinafter provided. If this Lease shall have been so terminated by Lessor pursuant to Articles 12 or 13 hereof, Lessor may at any time thereafter resume possession of the Premises by any lawful means and remove Lessee or other occupants and their effects. Lessee shall pay to Lessor, on demand, such expenses as Lessor may incur, including, without limitation, court costs and reasonable attorney's fees and disbursements, in enforcing the performance of any obligation of Lessee under this Lease.

14.   **DEFICIENCY:**

In any case where Lessor has recovered possession of the Premises by reason of Lessee's default, Lessor may, at Lessor's option, occupy the Premises or cause the Premises to be redecorated, altered, divided, consolidated with other adjoining premises or otherwise changed or prepared for reletting, and may relet the Premises or any part thereof, as agent of Lessee or otherwise, for a term or terms to expire prior to, at the same time as or subsequent to, the original Expiration Date of this Lease, at Lessor's option and receive the rent therefor. Rent so received shall be applied first to the payment of such expenses as Lessor may have incurred in connection with the recovery of possession, redecorating, altering, dividing, consolidating with other adjoining premises, or otherwise changing or preparing for reletting, and the reletting, including brokerage and reasonable attorney's fees, and then to the payment of damages in amounts equal to the Fixed Basic Rent and Additional Rent hereunder as set forth in this Article 14, and to the costs and expenses of performance of the other covenants of Lessee as herein provided. Lessee agrees, in any such case, whether or not Lessor has relet, to pay to Lessor damages equal to the Fixed Basic Rent and Additional Rent from the date of such default to the date of expiration of the term demised and other sums herein agreed to be paid by Lessee, less the net proceeds of the reletting, if any, received by Lessor during the remainder of the unexpired term hereof, as ascertained from time to time, and the same shall be payable by Lessee on the several rent days above specified. Lessee shall not be entitled to any surplus accruing as a result of any such reletting. In reletting the Premises as aforesaid, Lessor may grant rent concessions as then granted in the marketplace, and Lessee shall not be credited therewith. No such reletting shall constitute a surrender and acceptance or be deemed evidence thereof. If Lessor elects, pursuant hereto, actually to occupy and use the Premises or any part thereof during any part of the balance of the Term as originally fixed or since extended, there shall be allowed against Lessee's obligation for rent or damages as herein defined, during the period of Lessor's occupancy, the reasonable value of such occupancy, not to exceed, in any event, the Fixed Basic Rent and Additional Rent herein reserved and such occupancy shall not be construed as a release of Lessee's liability hereunder. Notwithstanding anything contained in this paragraph to the contrary, any costs incurred by Lessor for redecorating, altering, dividing, consolidating with other adjoining premises, or otherwise changing or preparing the Premises for reletting, including brokerage and reasonable attorney's fees, shall be amortized over the term of the next succeeding lease and only the portion of such amortized costs that falls within the period commencing on the

date of default and ending with the original Expiration Date shall be deemed a part of Lessor's damages hereunder.

Alternatively, in any case where Lessor has recovered possession of the Premises by reason of Lessee's default, Lessor may at Lessor's option, and at any time thereafter, and without notice or other action by Lessor, and without prejudice to any other rights or remedies it might have hereunder or at law or equity, become entitled to recover from Lessee, as Damages for such breach, in addition to such other sums herein agreed to be paid by Lessee, to the date of re-entry, expiration and/or dispossess, an amount equal to the difference between the Fixed Basic Rent and Additional Rent reserved in this Lease from the date of such default to the date of Expiration of the original Term demised and the then fair and reasonable rental value of the Premises for the same period. Said Damages shall become due and payable to Lessor immediately upon such breach of this Lease and without regard to whether this Lease be terminated or not, and if this Lease be terminated, without regard to the manner in which it is terminated. In the computation of such Damages, the difference between an installment of Fixed Basic Rent and Additional Rent thereafter becoming due and the fair and reasonable rental value of the Premises for the period for which such installment was payable shall be discounted to the date of such default at the rate of six percent (6%) per annum.

Lessee hereby waives all right of redemption to which Lessee or any person under Lessee might be entitled by any law now or hereafter in force.

Lessor's remedies hereunder are in addition to any remedy allowed by law.

**15.  SUBORDINATION OF LEASE:**

This Lease shall, at Lessor's option, or at the option of any holder of any underlying lease or holder of any mortgages or trust deed, be subject and subordinate to any such underlying leases and to any such mortgages or trust deed which may now or hereafter affect the real property of which the Premises form a part, and also to all renewals, modifications, consolidations and replacements of said underlying leases and said mortgages or trust deed. Although no instrument or act on the part of Lessee shall be necessary to effectuate such subordination, Lessee will, nevertheless, execute and deliver such further instruments confirming such subordination of this Lease as may be desired by the holders of said mortgages or trust deed or by any of the lessor's under such underlying leases. Lessee hereby appoints Lessor attorney-in-fact, irrevocably, to execute and deliver any such instrument for Lessee. If any underlying lease to which this Lease is subject terminates, Lessee shall, on timely request, attorn to the owner of the reversion.

**16.  SECURITY DEPOSIT:**

Lessee shall deposit with Lessor on the signing of this Lease, the Security Deposit as defined in the Preamble for the full and faithful performance of Lessee's obligations under this Lease, including without limitation, the surrender of possession of the Premises to Lessor as herein provided. If Lessor applies any part of said Security Deposit to cure any default of Lessee, Lessee shall, on demand, deposit with Lessor the amount so applied so that Lessor shall have the full Security Deposit on hand at all times during the Term of this Lease. In the event of a bona fide sale, subject to this Lease, Lessor shall have the right to transfer the Security Deposit to the vendee, and upon such transfer to the vendee, Lessor shall be considered released by Lessee from all liability for the return of the Security Deposit; and Lessee agrees to look solely to the new lessor for the return of the Security Deposit, and it is agreed that this shall apply to every transfer or assignment made of the Security Deposit to the new lessor. Provided this Lease is not in default, the Security Deposit (less any portions thereof used, applied or retained by Lessor in accordance with the provisions of this Article 16), shall be returned to Lessee after the expiration or sooner termination of this Lease and after delivery of the entire Premises to Lessor in accordance with the provisions of this Lease. Lessee covenants that it will not assign or encumber or attempt to assign or encumber the Security Deposit and Lessor shall not be bound by any such assignment, encumbrance or attempt thereof.

In the event of the insolvency of Lessee, or in the event of the entry of a judgment in any court against Lessee which is not discharged within ninety (90) days after entry, or in the event a petition is filed by or against Lessee under any chapter of the bankruptcy laws of the State of New Jersey or the United States of America, then in such event, Lessor may require the Lessee to deposit additional security in an amount which in Lessor's sole judgment would be sufficient to adequately assure Lessee's performance of all of its obligations under this Lease including all payments subsequently accruing. Failure of Lessee to deposit the security required by this Article 16 within ten (10) days after Lessor's written demand shall constitute a material breach of this Lease by Lessee.

17.  **RIGHT TO CURE LESSEE'S BREACH:**

If Lessee breaches any covenant or condition of this Lease, Lessor may, on reasonable notice to Lessee (except that no notice need be given in case of emergency), cure such breach at the expense of Lessee and the reasonable amount of all expenses, including attorney's fees, incurred by Lessor in so doing (whether paid by Lessor or not) shall be deemed Additional Rent payable on demand.

18.  **MECHANIC'S LIENS:**

Lessee shall, within fifteen (15) days after notice from Lessor, discharge or satisfy by bonding or otherwise any mechanic liens for materials or labor claimed to have been furnished to the Premises on Lessee's behalf.

19.  **RIGHT TO INSPECT AND REPAIR:**

Lessor may enter the Premises but shall not be obligated to do so (except as required by any specific provision of this Lease) at any reasonable time on reasonable notice to Lessee (except that no notice need be given in case of emergency) for the purpose of inspection or the making of such repairs, replacement or additions in, to, on and about the Premises or the Building, as Lessor deems necessary or desirable, provided, however, Lessor may not materially reduce the size of or reconfigure the Premises in a materially adverse manner. Lessee shall have no claims or cause of action against Lessor by reason thereof. Except for Lessee's right to abate the rent to the extent provided in Article 21 hereof, in no event shall Lessee have any claim against Lessor for interruption of Lessee's business, however occurring, including but not limited to that arising from the negligence of Lessor, its agents, servants or invitees, or from defects, errors or omissions in the construction or design of the Premises and/or the Building, including the structural and non-structural portions thereof. However, Lessor shall undertake any such activities in a manner so as to only interfere with Tenant's use and enjoyment of the Premises to the minimal extent reasonably possible.

20.  **SERVICES TO BE PROVIDED BY LESSOR/LESSOR'S EXCULPATION:**

Subject to intervening laws, ordinances, regulations and executive orders, Lessor agrees to furnish, except on holidays, as set forth on Exhibit E attached hereto and made a part hereof:

a.     The cleaning services, as set forth on Exhibit D attached hereto and made a part hereof, and subject to the conditions therein stated. Except as set forth on Exhibit D, Lessee shall pay the cost of all other cleaning services required by Lessee.

b.     Heating, ventilating and air conditioning (herein "HVAC") as appropriate for the season, and as set forth on Exhibit C-1, attached hereto and made a part hereof, during Building Hours, as defined in the Preamble, together with Common Facilities lighting to the extent reasonably necessary and electric energy 24 hours a day, 365 days a year (except in the case of an emergency).

c.     Cold and hot water for drinking and lavatory purposes.

d.     Elevator service 24 hours a day, 365 days a year (except in the case of an emergency) (if the Building contains an elevator or elevators for the use of the occupants thereof).

13

e.   Restroom supplies and exterior window cleaning when reasonably required.

f.   Notwithstanding the requirements of Exhibit C-1 (as to HVAC) or D or any other provision of this Lease, Lessor shall not be liable for failure to furnish any of the aforesaid services when such failure is due to Force Majeure, as hereinafter defined. Except for Lessee's right to abate the rent to the extent provided in Article 21 hereof, Lessor shall not be liable, under any circumstances, including, but not limited to, that arising from the negligence of Lessor, its agents, servants or invitees, or from defects, errors or omissions in the construction or design of the Premises and/or the Building, including the structural and non-structural portions thereof, for loss of or injury to Lessee's business or to property, however occurring, through or in connection with or incidental to the furnishings of, or failure to furnish, any of the aforesaid services or for any interruption to Lessee's business, however occurring.

## 21.   INTERRUPTION OF SERVICES OR USE:

Interruption, curtailment or material interruption of any service maintained in the Building or at the Office Building Area, if caused by Force Majeure, as hereinafter defined, shall not entitle Lessee to any claim against Lessor or to any abatement in rent, and shall not constitute a constructive or partial eviction, unless Lessor fails to take measures as may be reasonable under the circumstances to restore the service without undue delay, which measures Lessor shall take. If there is an interruption, curtailment or material interruption of any such service, for a period of seven (7) consecutive business days, or more than seven (7) out of any ten (10) consecutive days, including during the period of the making of repairs, replacements or additions, other than those caused by misuse or neglect by Lessee, or Lessee's agents, servants, visitors or licensees, there shall be a proportionate abatement of Rent from and after said seventh (7th) day and continuing for the period of such interruption curtailment or material interruption. In no event, shall Lessee be entitled to claim a constructive eviction from the Premises unless Lessee shall first have notified Lessor in writing of the condition or conditions giving rise thereto, and if the complaints be justified, unless Lessor shall have failed, within a reasonable time after receipt of such notice, to remedy, or commence and proceed with due diligence to remedy such condition or conditions, all subject to Force Majeure as hereinafter defined.

## 22.   BUILDING STANDARD OFFICE ELECTRICAL SERVICE:

The cost of electric current which is supplied by the Lessor for use by the Lessee in the Premises, other than for heating or air conditioning purposes, shall be reimbursed to the Lessor at terms, classification and rates normally charged by the public utility companies serving that part of the municipality where the subject Premises are located and applicable utility suppliers.

a.   From and after the Commencement Date, Lessee agrees to pay as Additional Rent an estimated electrical charge of $.10 per square foot per month, payable on the first day of each and every month, until such time as an electrical survey can be performed pursuant to Article 22(b) below.

b.   Lessee agrees that an independent electrical engineering consultant shall make a survey of electric power demand of the electric lighting fixtures and the electric equipment of Lessee used in the Premises to determine the average monthly electric consumption thereof, and the costs of said survey shall be borne by Lessee. Lessee's cost of the survey shall not exceed $500.00. The findings of said consultant as to the average monthly electric consumption of Lessee shall, unless objected to by Lessee within forty-five (45) days, be conclusive and binding on Lessor and Lessee. After Lessor's consultant has submitted its report, Lessee shall pay to Lessor, within ten (10) days after demand therefor by Lessor, the amount (based on the monthly consumption found by such consultant) as owing from the Lease Term's Commencement Date, and the then expired months, to include the then current month and thereafter adjusted for the estimated electrical charges already paid pursuant to Article 22(a), on the first day of every month, in advance, the amount set forth as the monthly consumption in said report. Said amounts shall be treated as

Additional Rent due hereunder. Proportionate sums shall be payable for periods of less than a full month if the Term commences or ends on any other than the first or last day of the month. If Lessee objects to said findings, Lessee shall nevertheless pay and continue to pay the amount determined by Lessor's consultant until the issue is finally resolved, but Lessee may, at its expense, seek the services of an independent electrical consultant who shall make a survey as provided above. If Lessor's and Lessee's consultant cannot agree as to Lessee's consumption within thirty (30) days of Lessee's consultant's findings either Lessor or Lessee may request the American Arbitration Association in Somerset, New Jersey to appoint an electrical engineering consultant whose decision shall be final and binding on Lessor and Lessee, and whose cost shall be shared equally. Upon the issue being finally resolved, any overpayment made by Lessee shall be promptly refunded.

c.   In the event that there shall be an increase or decrease in the terms, classification and rates normally charged (including surcharges or demand adjustments), of the public utility for the supply of Building Standard Office Electrical Service, or the imposition of any tax with respect to such service or increase in any such tax following the Lease Term's commencement, the Additional Rent payable hereunder shall be adjusted equitably to reflect the increase or decrease in rate or imposition or increase in the aforesaid tax. All computations shall be made on the basis of Lessee's surveyed usage as if a meter exclusively measuring such usage to the Premises was in place.

d.   Lessee covenants that it shall notify Lessor immediately upon the introduction of any office equipment or lighting which is materially different from that on the Premises as of Lessor's electrical survey or a material addition to the aforesaid equipment or lighting on the Premises as of said survey. The introduction of any material new or different equipment or lighting shall be cause for, at Lessor's election, a resurveying of the Premises at Lessee's expense. Lessor reserves the right to inspect the Premises on reasonable advance notice to Lessee during Business Hours to insure compliance with this provision.

e.   Except as set forth herein Lessor shall not be liable in any way to Lessee for any loss, damage or expense which Lessee may sustain or incur as a result of any failure, defect or change in the quantity or character of electrical energy available for redistribution to the Premises pursuant to this Article 22 nor for any interruption in the supply, and Lessee agrees that such supply may be interrupted for inspection, repairs and replacement and in emergencies. In any event, the full measure of Lessor's liability for any interruption in the supply due to Lessor's acts or omissions shall be an abatement of Fixed Basic Rent and Additional Rent as set forth herein, unless Lessor fails to take such measures as may be reasonable under the circumstances to restore such service without undue delay. In no event shall Lessor be liable for any business interruption suffered by Lessee.

f.   Lessor, at Lessee's expense, shall furnish and install all replacement lighting tubes, lamps, ballasts and bulbs required in the Premises (Lessor to deliver the Premises with all such tubes, lamps, ballasts and bulbs in place and in good working condition). Lessee, however, shall have the right to furnish and/or install any or all of the items mentioned in this Article 22(f).

g.   Lessee's use of electrical service as contemplated herein shall be during Building Hours, and any use in excess of said Building Hours shall result in an adjustment as set forth in Article 22(a) hereof to reflect such additional consumption. Notwithstanding the foregoing, it is understood that if the electrical survey conducted pursuant to Article 22(a) hereof contemplated Lessee's use of the Premises in excess of Building Hours, then no additional adjustment in electric charges is necessary by reason of such excess usage.

23.   **ADDITIONAL RENT:**

It is expressly agreed that Lessee will pay in addition to the Fixed Basic Rent provided in Article 3 hereof, an Additional Rent to cover Lessee's Percentage as defined in the Preamble, of the increased cost to Lessor, for each of the categories enumerated herein, over the "Base Period Costs", as defined in the Preamble for said categories.

15

a.  **Operating Cost Escalation** -- If the Operating Costs incurred for the Building in which the Premises are located and Office Building Area for any Lease Year or Partial Lease Year during the Lease Term shall be greater than the Base Operating Costs (adjusted proportionately for periods less than a Lease Year), then Lessee shall pay to Lessor, as Additional Rent, Lessee's Percentage of all such excess Operating Costs. Operating Costs shall include, by way of illustration and not of limitation: personal property taxes; management fees not to exceed management fees charged by comparable owners of comparable buildings in Parsippany, New Jersey; labor, including all wages and salaries; social security taxes, and other taxes which may be levied against Lessor upon such wages and salaries, for employees such as superintendents to the extent such employees service the Building or Office Building Area; supplies; repairs and maintenance; maintenance and service contracts (amortized over the life of the contract); painting; wall and window washing; laundry and towel service; tools and equipment (which are not required to be capitalized for federal income tax purposes); trash removal; lawn care; snow removal and all other items properly constituting direct operating costs according to standard accounting practices (hereinafter collectively referred to as the "Operating Costs"), but not including depreciation of Building or equipment; interest or principal; ground rent; income or excess profits taxes; costs of maintaining the Lessor's corporate existence; Lessor's overhead and general and administrative expenses; franchise taxes; judgments against Lessor; fees and expenses incurred by Lessor in lawsuits; late payment fees, penalties or interest; any expenditures required to be capitalized for federal income tax purposes, unless said expenditures are for the purpose of reducing Operating Costs within the Building and Office Building Area, or those which under generally applied real estate practice are expensed or regarded as deferred expenses or are required under any governmental or quasi-governmental law, statute, ordinance, rule, order, requirements or regulation, in which event the costs thereof shall be included; any expenditures for the benefit of any one or more tenants, but not the Building as a whole; advertising and promotional costs; any commissions, legal fees, tenant improvement work or other expenditures incurred in connection with attracting tenants to the Building; any expenditures for which reimbursement is due from any insurer or other third party; any fees or expenses payable to any third party professional which are not expended for the benefit of the Building as a whole; payment to Lessor or any affiliate of Lessor to the extent such payment exceeds the fair market value of whatever asset or service is being provided; or reserves. Operating Costs shall be reduced by any reimbursement, credit, discounts, reductions, or other allowances received by Lessor. Notwithstanding anything contained herein to the contrary, any additional costs incurred by Lessor during the 2004 Calendar Year by reason of Lessor or any of its vendors entering into new labor contracts or renewals or modifications of existing labor contracts shall not be included in Base Operating Costs. The Base Operating Costs shall be as defined in the Preamble.

If any repair, replacement or improvement within the definition of Operating Costs is capitalized under generally accepted accounting principles, then (A) the cost of any such repair, replacement or improvement shall only be included in Operating Costs if such repair, replacement or improvement (i) is necessary to comply with any governmental or quasi-governmental law, statute, ordinance, rule, order, requirements or regulation, which is enacted or promulgated after the date hereof, (ii) is reasonably intended to reduce Operating Costs or (iii) constitutes a replacement which in Lessor's reasonable judgment is economically prudent to make in lieu of repairs, (B) the cost thereof shall be amortized on a straight line basis over the lesser of (i) ten (10) years or (ii) the useful life of such repair, the amount so amortized attributable to such repair, replacement or improvement and (C) there shall be included in Operating Costs in each Lease Year for such portion of the amortization period which occurs during the Term, provided, however, that all amounts thereof included in Operating Costs in any Lease Year subsequent to the year paid shall have added thereto interest from the date Lessor incurred such cost. For amortization purposes, applicable interest shall be two (2) percentage points in excess of the prime rate charged by Chase Manhattan Bank, or its successor, at the time of expenditure.

b.  **Fuel, Utilities and Electric Cost Escalation** (hereinafter referred to as "Utility and Energy Costs") – If the Utility and Energy Costs, including any fuel surcharges or adjustments with respect thereto, incurred for water, sewer, gas, electric, other

utilities and heating, ventilating and air conditioning for the Building, to include all leased and leasable areas (not separately billed or metered within the Building), and Common Facilities electric, lighting, water, sewer and other utilities for the Building and Office Building Area, for any Lease Year or Partial Lease Year, during the Term, shall be greater than the Utility and Energy Costs Expense Stop (adjusted proportionately for periods less than a Lease Year), then Lessee shall pay to Lessor as Additional Rent, Lessee's Percentage of all such excess Utility and Energy Costs. As used in this Article 23, the Utility and Energy Costs Expense Stop shall be as defined in the Preamble.

c.   **Tax Escalation** -- If the Real Estate Taxes for the Building and Office Building Area at which the Premises are located for any Lease Year or Partial Lease Year, during the Lease Term, shall be greater than the Base Real Estate Taxes (adjusted proportionately for periods less than a Lease Year), then Lessee shall pay to Lessor as Additional Rent, Lessee's Percentage as hereinafter defined, of all such excess Real Estate Taxes.

As used in this Article 23(c), the words and terms which follow mean and include the following:

   i.   "Base Real Estate Taxes" shall be as defined in the Preamble.

   ii.  "Real Estate Taxes" shall mean the property taxes and assessments imposed upon the Building and Office Building Area, or upon the rent, as such, payable to the Lessor, including, but not limited to, real estate, city, county, village, school and transit taxes, or taxes, assessments, or charges levied, imposed or assessed against the Building and Office Building Area by any other taxing authority, whether general or specific, ordinary or extraordinary, foreseen or unforeseen. If due to a future change in the method of taxation, any franchise, income or profit tax shall be levied against Lessor in substitution for, or in lieu of, or in addition to, any tax which would otherwise constitute a Real Estate Tax, such franchise, income or profit tax shall be deemed to be a Real Estate Tax for the purposes hereof; conversely, any additional real estate tax hereafter imposed in substitution for, or in lieu of, any franchise, income or profit tax (which is not in substitution for, or in lieu of, or in addition to, a Real Estate Tax as hereinbefore provided) shall not be deemed a Real Estate Tax for the purposes hereof.

d.   **Insurance Cost Escalation** – If the Insurance Costs for the Building and Office Building Area for any Lease Year or partial Lease Year during the Term shall be greater than the Insurance Cost Expense Stop (adjusted proportionately for periods less than a Lease Year), Lessee shall pay to Lessor as Additional Rent for each Lease Year or partial Lease Year commencing from and after the Commencement Date, Lessee's Percentage of such excess Insurance Costs.

As used in this Article 23(d), the words and terms which follow mean and include the following:

   i.   "Insurance Cost Expense Stop" shall be as defined in the Preamble.

   ii.  "Insurance Costs" shall mean all fire and other insurance costs incurred by Lessor in connection with its operation and maintenance of the Building and Office Building Area, for any Lease Year or Partial Lease Year, during the Term.

e.   **Lease Year** – As used in this Article 23, Lease Year shall mean a calendar year. Any portion of the Term which is less than a Lease Year as hereinbefore defined, that is, from the Commencement Date through the following December 31, and from the last January 1, falling within the Term to the end of the Term, shall be deemed a "Partial Lease Year". Any reference in this Lease to a Lease Year shall, unless the context clearly indicates otherwise, be deemed to be a reference to a Partial Lease Year if the period in question involves a Partial Lease Year.

f.  **Payment** -- At any time, and from time to time, after the establishment of the Base Period Costs for each of the categories referred to above, Lessor shall advise Lessee in writing of Lessee's Percentage share with respect to each of the categories as estimated for the next twelve (12) month period (or proportionate part thereof if the last period prior to the Lease's expiration is less than twelve (12) months) as then known to the Lessor, and thereafter, the Lessee shall pay as Additional Rent, Lessee's Percentage share of these costs for the then current period affected by such advice (as the same may be periodically revised by Lessor as additional costs are incurred) in equal monthly installments, such new rates being applied to any months, for which the Fixed Basic Rent shall have already been paid which are affected by the Operating Cost Escalation and/or Utility and Energy Cost Escalation and/or Tax Escalation Costs and/or Insurance Costs above referred to, as well as the unexpired months of the current period, the adjustment for the then expired months to be made at the payment of the next succeeding monthly rental, all subject to final adjustment at the expiration of each Lease Year as defined in Article 23(e) hereof (or Partial Lease Year if the last period prior to the Lease's termination is less than twelve (12) months). If Lessee owes Additional Rent hereunder for any Lease Year or Partial Lease Year after the expiration of such Lease Year or Partial Lease Year, as the case may be, Lessee shall pay such Additional Rent within ten (10) days after Lessee's receipt of an invoice therefor. If Lessee has overpaid Additional Rent for such Lease Year or Partial Lease Year, as the case may be, then Lessor, at Lessor's option, shall either refund such overpayment or credit such overpayment against future Additional Rent payments due and payable by Lessee hereunder. However, Lessor shall be reimbursed by Lessee monthly during the first year of the Term for additional Utility and Energy Cost Escalations resulting from an increase in the monthly rate over the Base Utility Rate.

In the event the last period prior to the Lease's termination is less than twelve (12) months, the Base Period Costs during said period shall be proportionately reduced to correspond to the duration of said final period.

If Real Estate Taxes for a Lease Year are reduced, the amount of Lessor's costs and expenses of obtaining such reduction (including legal, appraisers' and consultants fees) shall be added to and deemed part of Real Estate Taxes for such Lease Year. If Lessor obtains a refund of Real Estate Taxes for a Lease Year which a Real Estate Tax payment has been made by Lessee, Lessor shall credit against Lessee's next succeeding Real Estate Tax payment(s), Lessee's Percentage of the refund (but not more than the Real Estate Tax payment that was the subject of the refund). If no Real Estate Tax payment shall thereafter be due, Lessor shall pay Lessee's Percentage of such refund to Lessee.

g.  **Books and Reports** -- For the protection of Lessee, Lessor shall maintain books of account which shall be open to Lessee and its representatives at all reasonable times so that Lessee can determine that such Operating, Utility and Energy and Real Estate Tax Costs have, in fact, been paid or incurred. Lessee's representatives shall mean only (i) Lessee's employees or (ii) a Certified Public Accounting firm, and neither Lessee's employees nor any Certified Public Accounting firm shall be permitted to (i) perform such inspection and/or audit on a contingency basis, or (ii) absent a prior relationship, perform such an inspection and/or audit for any other tenant in the Building.  At Lessor's request, Lessee shall execute a confidentiality agreement reasonably acceptable to Lessor prior to any examination of Lessor's books and records.  In the event Lessee disputes any one or more of said charges, Lessee shall attempt to resolve such dispute with Lessor, provided that if such dispute shall not be satisfactorily settled between Lessor and Lessee, the dispute shall be referred to either party to an independent certified public accountant to be mutually agreed upon, and if such an accountant cannot be agreed upon, The American Arbitration Association may be asked by either party to select an arbitrator, whose decision on the dispute will be final and binding upon both parties, who shall jointly share any cost of such arbitration. Pending resolution of said dispute the Lessee shall pay to Lessor the sum so billed by Lessor subject to its ultimate resolution as aforesaid.

h.  **Right of Review** -- Once Lessor shall have finally determined said Operating, Utility and Energy or Real Estate Tax Costs at the expiration of a Lease Year, then as to the item so established, Lessee shall only be entitled to dispute said charge as finally

18

established for a period of six (6) months after such charge is finally established, and Lessee specifically waives any right to dispute any such charge at the expiration of said six (6) month period.

i. **Occupancy Adjustment** -- If, with respect to Operating Cost Escalation, as established in Article 23(a) hereof, the Building is less than ninety-five percent (95%) occupied during the establishment of the respective Base Periods, then the Base Costs incurred with respect to said Operating Cost shall be adjusted during any such period within the Base Period so as to reflect ninety-five percent (95%) occupancy. Similarly, if during any Lease Year or Partial Lease Year, subsequent to the Base Period the Building is less than ninety-five percent (95%) occupied, then the actual costs incurred for Operating Cost and Utility and Energy Cost shall be increased during any such period to reflect ninety-five percent (95%) occupancy so that at all times after the Base Period the Operating Cost shall be actual costs, but in the event less than ninety-five percent (95%) of the Building is occupied during all or part of the Lease Year involved, the Operating Cost shall not be less than that which would have been incurred had ninety-five percent (95%) of the Building been occupied. The aforesaid adjustment shall only be made with respect to those items that are in fact affected by variations in occupancy levels.

## 24. LESSEE'S ESTOPPEL:

Lessee shall, from time to time, on not less that ten (10) days prior written request by Lessor, execute, acknowledge and deliver to Lessor a written statement certifying that the Lease is unmodified and in full force and effect, or that the Lease is in full force and effect as modified and listing the instruments of modification; the dates to which the rents and charges have been paid; and, to the best of Lessee's knowledge, whether or not Lessor is in default hereunder, and if so, specifying the nature of the default. It is intended that any such statement delivered pursuant to this Article 24 may be relied on by a prospective purchaser of Lessor's interest or mortgagee of Lessor's interest or assignee of any mortgage of Lessor's interest. Lessee shall also execute and deliver the form "Lessee Estoppel Certificate" attached hereto as Exhibit F.

Lessor shall, from time to time, on not less than ten (10) days prior written request by Lessee, execute, acknowledge and deliver to Lessee a written statement certifying that the Lease is unmodified and in full force and effect, or that the Lease is in full force and effect as modified and listing the instruments of modification; the dates to which the rents and charges have been paid; and, to the best of Lessor's knowledge, whether or not Lessee is in default hereunder, and if so, specifying the nature of the default. It is intended that any such statement delivered pursuant to this Article 24 may be relied on by a prospective assignee of Lessee's interest or mortgagee of Lessee's interest or subtenant.

## 25. HOLDOVER TENANCY:

If Lessee holds possession of the Premises after the Expiration Date of this Lease, Lessee shall (i) become a tenant from month to month under the provisions herein provided, but at one-hundred seventy-five percent (175%) of the monthly Fixed Basic rent for the last month of the Term, plus the Additional Rent, for the first month of Lessee's holding over and two hundred percent (200%) of the monthly Fixed Basic Rent for the last month of the Term, plus the Additional Rent, thereafter, which shall continue as provided in the Lease which sum shall be payable in advance on the first day of each month, and without the requirement for demand or notice by Lessor to Lessee demanding delivery of possession of said Premises, and such tenancy shall continue until terminated by Lessor, or until Lessee shall have given to Lessor, at least sixty (60) days prior to the intended date of termination, a written notice of intent to terminate such tenancy, which termination date must be as of the end of a calendar month; and (ii) indemnify Lessor against loss or liability resulting from the delay by Lessee in so surrendering the Premises including, without limitation, any claims made by any succeeding occupant founded on such delay. Lessee's obligations under this Section shall survive the expiration or sooner termination of the Lease. The time limitations described in this Article 25 shall not be subject to extension for Force Majeure.

**26.  RIGHT TO SHOW PREMISES:**

Lessor may show the Premises to prospective purchasers and mortgagees; and during the twelve (12) months prior to termination of this Lease, to prospective tenants, during Building Hours on reasonable notice to Lessee.

**27.  LESSOR'S WORK – LESSEE'S DRAWINGS:**

a.  Lessor agrees that, prior to the commencement of the Term of this Lease, it will do the demolition work, carpet and paint the Premises in accordance with Exhibit C attached hereto and made a part hereof. All other work required to be performed by Lessor pursuant to Exhibit C shall be performed within a commercially reasonable and mutually satisfactory time after the commencement of the Term during hours other than Building Hours. The portion of The Work (as defined in Exhibit C) being performed after the Commencement Date shall be performed by Lessor using reasonable efforts to minimize interference with Lessee's use of the Premises.

b.  Lessee will timely supply such drawings and information to Lessor as set forth in Exhibit C.

**28.  WAIVER OF TRIAL BY JURY:**

To the extent such waiver is permitted by law, the parties waive trial by jury in any action or proceeding brought in connection with this Lease or the Premises.

**29.  LATE CHARGE:**

Anything in this Lease to the contrary notwithstanding, at Lessor's option, Lessee shall pay a "Late Charge" of eight percent (8%) of any installment of Fixed Basic Rent or Additional Rent paid more than five (5) days after the due date thereof, to cover the extra expense involved in handling delinquent payments, said Late Charge to be considered Additional Rent. The amount of the Late Charge to be paid by Lessee shall be reassessed and added to Lessee's obligations for each successive monthly period until paid.

Notwithstanding anything in this Article to the contrary, Lessor shall waive a Late Charge one time during each Lease Year provided, however, the installment of Fixed Basic Rent or Additional Rent so due is paid by the fifteenth (15th) day of the month. Payment received subsequent to the fifteenth (15th) of the month during these grace periods shall require a Late Charge to be reassessed and added to Lessee's obligations hereunder.

**30.  LESSEE'S INSURANCE:**

a.  Lessee covenants to provide at Lessee's cost and expense on or before the earlier of (i) the Commencement Date, or (ii) Lessee's taking actual possession for the purpose of completing any improvement work, and to keep in full force and effect during the entire Term and so long thereafter as Lessee, or anyone claiming by, through or under Lessee, shall occupy the Premises, insurance coverage as follows:

i.  Commercial General Liability insurance with contractual liability endorsements with respect to the Premises and the business of Lessee in which Lessee shall be adequately covered under limits of liability of not less than THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) combined single limit per occurrence for bodily or personal injury (including death) and property damage. Such insurance may be carried (x) under a blanket policy covering the Premises and other locations of Lessee, if any, provided that each such policy shall in all respects comply with this Article and shall specify that the portion of the total coverage of such policy that is allocated to the Premises is in the amounts required pursuant to this Article 30 and (y) under a primary liability policy of not less than ONE MILLION AND 00/100

20

DOLLARS ($1,000,000.00) and the balance under an umbrella policy. Notwithstanding anything to the contrary contained in this Lease, the carrying of insurance by Lessee in compliance with this Article 30 shall not modify, reduce, limit or impair Lessee's obligations and liability under Article 33 hereof.

ii.     Fire and Extended Coverage, Vandalism, Malicious Mischief, Sprinkler Leakage and Special Extended Coverage Insurance in an amount adequate to cover the cost of replacement of all personal property, decoration, trade fixtures, furnishings, equipment in the Premises and all contents therein. Lessor shall not be liable for any damage to such property of Lessee by fire or other peril includable in the coverage afforded by the standard form of fire insurance policy with extended coverage endorsement attached (whether or not such coverage is in effect), no matter how caused, it being understood that the Lessee will look solely to its insurer for reimbursement.

iii.    Worker's Compensation Insurance in the minimum statutory amount covering all persons employed by Lessee.

iv.     Said limits shall be subject to periodic review once every three (3) years, and Lessor reserves the right to increase said coverage limits in connection with such review if, in the reasonable opinion of Lessor, said coverage becomes inadequate and is less than that commonly maintained by tenants in similar buildings in the area by tenants making similar uses. On or before the Commencement Date, and thereafter at Lessor's request, Lessee shall provide Lessor evidence of the insurance coverage required herein in the form of a duplicate original insurance policy, an insurance binder (countersigned by the insurer), or Evidence of Insurance (in form ACORD 27 with respect to property insurance and ACORD 25-S with respect to liability insurance) for each of the insurance policies Lessee is required to carry in compliance with its obligations under this Lease.

b.  All of the aforesaid insurance shall (i) name Lessor as an additional insured on a primary basis; (ii) be written by one or more responsible insurance companies licensed in the State of New Jersey satisfactory to Lessor and in form satisfactory to Lessor; (iii) contain endorsements substantially as follows: "It is understood and agreed that the insurer will give to Lessor, or any successor lessor, c/o Mack-Cali Realty Corporation, 11 Commerce Drive, Cranford, New Jersey, thirty (30) days prior written notice of any material change in or cancellation of this policy."; (iv) shall be written on an "occurrence" basis and not on a "claims made" basis.

c.  Lessee shall be solely responsible for payment of premium and Lessor (or its designee) shall not be required to pay any premium for such insurance. Lessee shall deliver to Lessor at least fifteen (15) days prior to the expiration of such policy, either a duplicate original or a certificate it being the intention of the parties hereto that the insurance required under the terms hereof shall be continuous during the entire Term of this Lease and any other period of time during which pursuant to the Term hereof, said insurance is required. Any insurance carried by Lessor shall be in excess of and will not contribute with the insurance carried by Lessee for injuries or damage arising out of the Premises.

d.  Lessee agrees, at its own cost and expense, to comply with all rules and regulations of the National Fire Protection Association (NFPA) National Fire Code. If, at any time or from time to time, as a result of or in connection with any failure by Lessee to comply with the foregoing sentence or any act or omission or commission by Lessee, its employees, agents, contractors or licensees, or a result of or in connection with the use to which the Premises are put (notwithstanding that such use may be for the purposes hereinbefore permitted or that such use may have been consented to by Lessor), the fire insurance rate(s) applicable to the Premises shall be higher than that which would be applicable for a business office legally permitted therein, Lessee agrees that it will pay to Lessor as Additional Rent, such portion of the premiums for all Lessor's fire insurance policies in force with respect to the building and the contents of any occupant thereof as shall be attributable to such higher rate(s).

21

e.   Lessor makes no representation that the limits of liability specified to be carried by Lessee or Lessor under the terms of this Lease are adequate to protect Lessee against Lessee's undertaking under this Article 30, and in the event Lessee believes that any such insurance coverage called for under this Lease is insufficient, Lessee shall provide, at its own expense, such additional insurance as Lessee deems adequate.

f.   (i) Lessor hereby waives its rights, if any, against Lessee with respect to damage or destruction by fire or other casualty to be insured against by Lessor, even if said fire or other casualty shall have been caused, in whole or in part, by the negligence of Lessee, and (ii) Lessee hereby waives its rights, if any, against Lessor with respect to such damage, or destruction by fire or other casualty to be insured against by Lessee, even if said fire or other casualty shall have been caused, in whole or in part, by the negligence of Lessor.  If Lessor's or Lessee's insurance carrier shall make a charge for the incorporation of the aforesaid waiver of subrogation in its policies, then the party requesting the waiver shall promptly pay such charge to the other party upon demand.  In the event the party requesting their waiver fails to pay such charge upon demand, the other party shall be released of its obligation to supply such waiver.

g.   Should Lessee fail to maintain the insurance coverage as set forth in this Article 30, then Lessee shall be in default hereunder and shall be deemed to have breached its covenants as set forth herein.

h.   During the Term, Lessor shall maintain the following insurance, insuring Lessor and any mortgagee, as their respective interests may appear: (x) insurance against damage to the Building and Office Building Area by all risks of direct physical loss in an amount equivalent to the full replacement cost thereof; (y) comprehensive general liability insurance against claims for bodily injury and property damage occurring in or about the Common Facilities in amounts customarily carried by owners of similar buildings in the Morris County, New Jersey area; and (z) insurance against such other hazards as, from time to time, are then commonly insured against for buildings similarly situated in amounts normally carried with respect thereto.  All insurance maintained pursuant to this paragraph may be effected by blanket insurance policies.

31.   **NO OTHER REPRESENTATIONS:**

No representations or promises shall be binding on the parties hereto except those representations and promises contained herein or in some future writing signed by the party making such representation(s) or promise(s).

32.   **QUIET ENJOYMENT:**

Lessor covenants that if, and so long as, Lessee pays Fixed Basic Rent, and any Additional Rent as herein provided, and performs Lessee's covenants hereof, Lessor and anyone claiming under or through Lessor shall do nothing to affect Lessee's right to peaceably and quietly have, hold and enjoy the Premises for the Term herein mentioned, subject to the provisions of this Lease.

33.   **INDEMNITY:**

Lessee shall defend, indemnify and save harmless Lessor and its agents against and from; (a) any and all claims (i) arising from (x) the conduct or management by Lessee, its subtenants, licensees, its or their employees, agents, contractors or invitees on the Premises or of any business therein, or (y) any work or thing whatsoever done, or any condition created (other than by Lessor for Lessor's or Lessee's account) in or about the Premises during the Term of this Lease, or during the period of time, if any, prior to the Commencement Date that Lessee may have been given access to the Premises, (z) any default by Lessee under the terms, covenants and conditions of this Lease or (ii) arising from any negligent or otherwise wrongful act or omission of Lessee or any of its subtenants or licensees or its or their employees, agents, contractors or invitees, and (b) all costs, expenses and liabilities including attorneys fees and disbursements incurred in or in connection with each such claim, action

or proceeding brought thereon. In case any action or proceeding be brought against Lessor by reason of any such claim, Lessee, upon notice from Lessor, shall resist and defend such action or proceeding.

Lessor shall indemnify and save harmless Lessee and Lessee's shareholders, officers, directors, employees, agents and contractors (collectively, the "Lessee Indemnitees") from and against any and all claims of whatever nature against Lessee and/or the Lessee Indemnitees arising directly from (1) any accident, injury or damage occurring within the Office Building Area or the Building but outside of the Premises where such accident, injury or damage results from the negligence or willful misconduct of Lessor, its agents, or employees or (2) any default by Lessor in the performance of Lessor's obligations under this Lease.

## 34.   ARTICLE HEADINGS:

The article headings in this Lease and position of its provisions are intended for convenience only and shall not be taken into consideration in any construction or interpretation of this Lease or any of its provisions.

## 35.   APPLICABILITY TO HEIRS AND ASSIGNS:

The provisions of this Lease shall apply to, bind and inure to the benefit of Lessor and Lessee, and their respective heirs, successors, legal representatives and assigns. It is understood that the term "Lessor" as used in this Lease means only the owner, a mortgagee in possession or a term lessee of the Building, so that in the event of any sale of the Building or of any lease thereof, or if a mortgagee shall take possession of the Premises, the Lessor herein shall be and hereby is entirely freed and relieved of all covenants and obligations of Lessor hereunder accruing thereafter, and it shall be deemed without further agreement that the purchaser, the term lessee of the Building, or the mortgagee in possession has assumed and agreed to carry out any and all covenants and obligations of Lessor hereunder.

## 36.   OUTSIDE PARKING SPACES:

Lessee's occupancy of the Premises shall include the use of the number of outside parking spaces as set forth in the Preamble, all of which will be unassigned. Lessor shall not be responsible for any damage or theft of any vehicle in the parking area and shall not be required to keep parking spaces clear of unauthorized vehicles or to otherwise supervise the use of the parking area.  Lessee shall, upon request, promptly furnish to Lessor the license numbers of the cars operated by Lessee and its subtenants, licensees, invitees, concessionaires, officers and employees. If any vehicle of the Lessee, or of any subtenant, licensee, concessionaire, or of their respective officers, agents or employees, is parked in any part of the Common Facilities other than the employee parking area(s) designated therefor by Lessor, Lessee shall pay to Lessor such penalty as may be fixed by Lessor from time to time.  All amounts due under the provisions of this Article 36 shall be deemed to be Additional Rent. If Lessor elects to designate parking spaces (other than handicapped spaces or spaces designated for a retail or retail banking use in the Building), then Lessor shall provide Lessee with Lessee's Percentage of such designated spaces.

## 37.   LESSOR'S LIABILITY FOR LOSS OF PROPERTY:

Intentionally Omitted.

## 38.   PARTIAL INVALIDITY:

If any of the provisions of this Lease, or the application thereof to any person or circumstances, shall to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby,

and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

### 39.   LESSEE'S BROKER:

Lessee represents and warrants to Lessor that its broker, as defined in the Preamble is the sole broker with whom Lessee has negotiated in bringing about this Lease and Lessee agrees to indemnify and hold Lessor and its mortgagee(s) harmless from any and all claims of other brokers and expenses in connection therewith arising out of or in connection with the negotiation of or the entering into this Lease by Lessor and Lessee if such claim is based on alleged actions of Lessee. Lessor agrees to indemnify and hold Lessee harmless from any and all claims of other brokers and expenses in connection therewith arising out of or in connection with the negotiation of or the entering into this Lease by Lessor and Lessee if such claim is based on alleged actions of Lessor.  In no event shall Lessor's mortgagee(s) have any obligation to any broker involved in this transaction. In the event that no broker was involved as aforesaid, then Lessee represents and warrants to the Lessor that no broker brought about this transaction, and Lessee agrees to indemnify and hold Lessor harmless from any and all claims of any broker arising out of or in connection with the negotiations of, or entering into of, this Lease by Lessee and Lessor if such claim is based on alleged actions of Lessee, and Lessor represents and warrants to the Lessee that no broker brought about this transaction, and Lessor agrees to indemnify and hold Lessee harmless from any and all claims of any broker arising out of or in connection with the negotiations of, or entering into of, this Lease by Lessee and Lessor if such claim is based on alleged actions of Lessor.

### 40.   PERSONAL LIABILITY:

Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Lessor, that there shall be absolutely no personal liability on the part of Lessor, its constituent members (to include but not be limited to, officers, directors, partners and trustees) their respective successors, assigns or any mortgagee in possession (for the purposes of this Article, collectively referred to as "Lessor"), with respect to any of the terms, covenants and conditions of this Lease, and that Lessee shall look solely to the equity of Lessor in the Building for the satisfaction of each and every remedy of Lessee in the event of any breach by Lessor of any of the terms, covenants and conditions of this Lease to be performed by Lessor, such exculpation of liability to be absolute and without any exceptions whatsoever.

### 41.   NO OPTION:

The submission of this Lease for examination does not constitute a reservation of, or option for, the Premises, and this Lease becomes effective as a Lease only upon execution and delivery thereof by Lessor and Lessee.

### 42.   DEFINITIONS:

a.   **Affiliate** -- Affiliate shall mean any corporation related to Lessee as a parent, subsidiary or brother-sister corporation so that such corporation and such party and other corporations constitute a controlled group as determined under Section 1563 of the Internal Revenue Code of 1986, as amended and as elaborated by the Treasury Regulations promulgated thereunder or any business entity in which Lessee has more than a fifty percent (50%) interest.

b.   **Common Facilities** -- Common Facilities shall mean the non-assigned parking areas; lobby; elevator(s); fire stairs; public hallways; public lavatories; all other general Building facilities that service all Building tenants; air conditioning rooms; fan rooms; janitors' closets; electrical closets; telephone closets; elevator shafts and machine rooms; flues; stacks; pipe shafts and vertical ducts with their enclosing walls. Lessor may at any time close temporarily any Common Facilities to make repairs or changes therein or to effect construction, repairs or changes within the

Building, or to discourage non-tenant parking, and may do such other acts in and to the Common Facilities as in its judgment may be desirable to improve the convenience thereof, but shall always in connection therewith, endeavor to minimize any inconvenience to Lessee. Lessor shall ensure that Lessee shall have access to restrooms on the first floor of the Building.

c.   **Force Majeure** -- Force Majeure shall mean and include those situations beyond Lessor's or Lessee's reasonable control, as applicable, including by way of example and not by way of limitation, acts of God; accidents; repairs; strikes; shortages of labor, supplies or materials; inclement weather; or, where applicable, the passage of time while waiting for an adjustment or insurance proceeds. Any time limits required to be met by either party hereunder, whether specifically made subject to Force Majeure or not, except those related to the payment of Fixed Basic Rent or Additional Rent, shall, unless specifically stated to the contrary elsewhere in this Lease, be automatically extended by the number of days by which any performance called for is delayed due to Force Majeure.

d.   **Lessee's Percentage** -- The parties agree that Lessee's Percentage, as defined in the Preamble, reflects and will be continually adjusted to reflect the ratio of the gross square feet of the area rented to Lessee (including an allocable share of all Common Facilities) [the numerator] as compared with the total number of gross square feet of the entire Building (or additional buildings that may be constructed within the Office Building Area) [the denominator] measured outside wall to outside wall, but excluding therefrom any storage areas. Lessor shall have the right to make changes or revisions in the Common Facilities of the Building so as to provide additional leasing area. Lessor shall also have the right to construct additional buildings in the Office Building Area for such purposes as Lessor may deem appropriate, and subdivide the lands for that purpose if necessary, and upon so doing, the Office Building Area shall become the subdivided lot on which the Building in which the Premises is located. However, if any service provided for in Article 23(a) or any utility provided for in Article 23(b) is separately billed or separately metered within the Building, then the square footage so billed or metered shall be subtracted from the denominator and the Lessee's proportionate share for such service and/or utility shall be separately computed, and the Base Costs for such item shall not include any charges attributable to said square footage. Lessee understands that as a result of changes in the layout of the Common Facilities from time to time occurring due to, by way of example and not by way of limitation, the rearrangement of corridors, the aggregate of all Building tenant proportionate shares may be equal to, less than or greater than one hundred percent (100%).

## 43.   **LEASE COMMENCEMENT:**

Notwithstanding anything contained herein to the contrary, if Lessor, for any reason whatsoever, including Lessor's negligence cannot deliver possession of the Premises, to Lessee at the commencement of the agreed Term as set forth in Article 2, this Lease shall not be void or voidable, nor shall Lessor be liable to Lessee for any loss or damage resulting therefrom, but in that event, the Term shall be for the full term as specified above to commence from and after the date Lessor shall have delivered possession of the Premises to Lessee or from the date Lessor would have delivered possession of the Premises to Lessee but for Lessee's failure to timely supply to Lessor such drawings and/or information required by Exhibit C or for any other reason attributable to Lessee (herein the "Commencement Date") and to expire midnight of the day immediately preceding Term anniversary of the Commencement Date, and if requested by Lessor, Lessor and Lessee shall, ratify and confirm said Commencement and Expiration Dates by completing and signing Exhibit G attached hereto and made a part hereof.

## 44.   **NOTICES:**

Any notice by either party to the other shall be in writing and shall be deemed to have been duly given only if (i) delivered personally or (ii) sent by registered mail or certified mail return receipt requested in a postage paid envelope addressed or (iii) sent by nationally recognized overnight delivery service, if to Lessee, at 9997 East Rose Hills Road, Whittier,

CA 90601, the attention of Mr. Steven Cronin; if to Lessor, at Lessor's address as set forth above; or, to either at such other address as Lessee or Lessor, respectively, may designate in writing. Notice shall be deemed to have been duly given, if delivered personally, on delivery thereof, if mailed, upon the tenth (10th) day after the mailing thereof or if sent by overnight delivery service, the next business day.

45. **ACCORD AND SATISFACTION:**

No payment by Lessee or receipt by Lessor of a lesser amount than the rent and additional charges payable hereunder shall be deemed to be other than a payment on account of the earliest stipulated Fixed Basic Rent and Additional Rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment for Fixed Basic Rent or Additional Rent be deemed an accord and satisfaction, and Lessor may accept such check or payment without prejudice to Lessor's right to recover the balance of such Fixed Basic Rent and Additional Rent or pursue any other remedy provided herein or by law.

46. **EFFECT OF WAIVERS:**

No failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this Lease, or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent during the continuance of any such breach, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No consent, or waiver, express or implied, by Lessor to or of any breach of any covenant, condition or duty of Lessee shall be construed as a consent or waiver to or of any other breach of the same or any other covenant, condition or duty, unless in writing signed by Lessor.

47. **LEASE CONDITION:**

Intentionally omitted.

48. **MORTGAGEE'S NOTICE AND OPPORTUNITY TO CURE:**

Lessee agrees to give any mortgagees and/or trust deed holders, by registered mail, a copy of any notice of default served upon Lessor, provided that, prior to such notice, Lessee has been notified in writing (by way of notice of assignment of rents and leases or otherwise) of the address of such mortgagees and/or trust deed holders. Lessee further agrees that, if Lessor shall have failed to cure such default within the time provided for in this Lease, then the mortgagees and/or trust deed holders shall have an additional thirty (30) days within which to cure such default, or if such default cannot be cured within that time, then such additional time as may be necessary, if within such thirty (30) days, any mortgagee and/or trust deed holder has commenced and is diligently pursuing the remedies necessary to cure such default, in which event this Lease shall not be terminated while such remedies are being so diligently pursued.

49. **LESSOR'S RESERVED RIGHT:**

Lessor and Lessee acknowledge that the Premises are in a Building which is not open to the general public. Access to the Building is restricted to Lessor, Lessee, their agents, employees and contractors and to their invited visitors. In the event of a labor dispute including a strike, picketing, informational or associational activities directed at Lessee or any other tenant, Lessor reserves the right unilaterally to alter Lessee's ingress and egress to the Building or make any change in operating conditions to restrict pedestrian, vehicular or delivery ingress and egress to a particular location.

50. **CORPORATE AUTHORITY:**

If Lessee is a corporation, Lessee represents and warrants that this Lease has been duly authorized and approved by the corporation's Board of Directors. The undersigned officers and representatives of the corporation represent and warrant that they are officers of the corporation with authority to execute this Lease on behalf of the corporation, and within fifteen (15) days of execution hereof, Lessee will provide Lessor with a corporate resolution confirming the aforesaid.

## 51.   AFTER-HOURS USE:

Lessee shall be entitled to make use of said HVAC beyond the Building Hours, at Lessee's sole cost and expense, provided Lessee shall notify the Lessor by 3:00 p.m. on the day that Lessee shall require said overtime use if said overtime use is required on any weekday, and by 3:00 p.m. on Friday for Saturday and/or Sunday overtime use. It is understood and agreed that Lessee shall pay the sum of SIXTY AND 00/100 DOLLARS ($60.00) per hour per zone for air-conditioning service and FORTY-FIVE AND 00/100 DOLLARS ($45.00) per hour per zone for heating services, plus such additional percentage increase of the aforesaid hourly sum computed by measuring the percentage increase between the rate in effect (including fuel surcharges or adjustments) during the month for which such overtime use is requested and the Base Rate. The Base Rate for purposes hereof shall be the average of the rates in effect (including surcharges and/or adjustments) during Calendar Year 2003. If other occupants of Lessee's zone also requested HVAC beyond the Building Hours, the charges set forth herein shall be aggregate charges for all such occupants, and shall be divided amongst all requesting occupants in proportion to the relative size of their respective premises.

## 52.   LESSEE'S EXPANSION/RELOCATION:

The Lessor, in its sole discretion, shall have the right from time to time to change the location of the Premises to other space (the "Substituted Leased Premises") within the Building, subject to the terms and conditions set forth below.

a.      The Substituted Leased Premises shall contain a minimum floor area of the same number of square feet as are contained in the Premises; and the minimum square footage of any Common Facilities attributable to the Substituted Leased Premises shall be the same as that of the Common Facilities attributable to the Premises.

b.      If the total square footage comprised by the Substituted Leased Premises and its attributable Common Facilities exceed the total of the Premises and its attributable Common Facilities, the Lessee shall not be required to pay any increase in the Fixed Basic Rent and Lessee's Percentage shall not be increased.

c.      The Lessor shall give the Lessee not less than forty-five (45) days prior notice of Lessor's decision to relocate the Lessee; and the Lessee agrees that no later than forty-five (45) days from the date of its receipt of such notice it shall relocate to the Substituted Leased Premises.

d.      The Lessor shall bear and pay for the cost and expense of any such relocation; provided, however, that the Lessee shall not be entitled to any compensation for damages for any interference with or interruption of its business during or resulting from such relocation; provided, however, if by reason of such relocation Lessee is unable to reasonably operate its business in the Building, then for each day that Lessee is not able to so operate its business in the Building by reason of such relocation, Lessee shall have no obligation to pay Fixed Basic Rent for seven (7) days. In no event shall Lessee be entitled to the rent abatement set forth herein if the reason that Lessee cannot reasonably operate its business in the Building is due to Lessee's own acts and/or omissions. The Lessor shall make reasonable efforts to minimize such interference.

e.      In connection with any such relocation, the Lessor shall, at its own cost and expense, furnish and install in (or, if practicable, relocate to) the Substituted Leased Premises all walls, partitions, floors, floor coverings, ceilings, fixtures, wiring and plumbing,

if any, (including trade fixtures, equipment, furniture, furnishings and other personal property belonging to Lessee) required for the Lessee's proper use and occupancy thereof, all of which items shall be comparable in quality to those situated in the Premises.

f. The payments of new monthly minimum rent shall commence on the earlier of ten (10) days after Lessor has completed the physical relocation and installation of permanent improvements in the Substituted Leased Premises or the date that Lessee first opens for business in the Substituted Leased Premises , subject to the provisions of paragraph d. above.

g. Lessor and Lessee shall promptly execute an amendment to this Lease reciting the relocation of the Premises and any changes in the monthly minimum rent payable hereunder.

## 53. <u>BUILDING PERMIT</u>:

Intentionally omitted.

## 54. <u>OPTION TO RENEW</u>:

(a) If the term of this Lease shall then be in full force and effect and there is then no existing default beyond any applicable grace and cure period, Lessee shall have the option to extend the term of this Lease for a period of five (5) years (the "Renewal Term") commencing on the day immediately following the Expiration Date, provided however that Lessee shall give Lessor notice of its election to extend the term no earlier than fifteen (15) months prior to the Expiration Date nor later than twelve (12) months prior to the Expiration Date of the initial term. **TIME BEING OF THE ESSENCE** in connection with the exercise of Lessee's option pursuant to this Article.

(b) Such extension of the term of this Lease shall be upon the same covenants and conditions, as herein set forth except for the Fixed Basic Rent (which shall be determined in the manner set forth below), and except that Lessee shall have no further right to extend the term of this Lease after the exercise of the single option described in paragraph (a) of this Section. If Lessee shall duly give notice of its election to extend the term of this Lease, the Renewal Term shall be added to and become a part of the Term of this Lease (but shall not be considered a part of the initial Term), and any reference in this Lease to the "Term of this Lease", the "Term hereof", or any similar expression shall be deemed to include such Renewal Term, and, in addition, the term "Expiration Date" shall thereafter mean the last day of such Renewal Term. Lessor shall have no obligation to perform any alteration or preparatory or other work in and to the Premises and Lessee shall continue possession thereof in its "as is" condition.

(c) If Lessee exercises its option for the Renewal Term, the Fixed Basic Rent during the Renewal Term shall be 95% of the fair market rent for the Premises, as hereinafter defined.

(d) Lessor and Lessee shall use their best efforts, within thirty (30) days after Lessor receives Lessee's notice of its election to extend the Term of this Lease for the Renewal Term ("Negotiation Period"), to agree upon the Fixed Basic Rent to be paid by Lessee during the Renewal Term. If Lessor and Lessee shall agree upon the Fixed Basic Rent for the Renewal Term, the parties shall promptly execute an amendment to this Lease stating the Fixed Basic Rent for the Renewal Term.

(e) If the parties are unable to agree on the Fixed Basic Rent for the Renewal Term during the Negotiation Period, then within fifteen (15) days after notice from the other party, given after expiration of the Negotiation Period, each party, at its cost and upon notice to the other party, shall appoint a person to act as an appraiser hereunder, to determine the fair market rent for the Premises for the Renewal Term. Each such person shall be a real estate broker or appraiser with at least ten years' active commercial real estate appraisal or brokerage experience (involving the leasing of office space as agent for both landlords and lessees) in the County of Morris. If a party does not appoint a person to act as an appraiser within said fifteen (15) day period, the person appointed by the other party shall be the sole appraiser and shall determine the aforesaid fair

market rent. Each notice containing the name of a person to act as appraiser shall contain also the person's address. Before proceeding to establish the fair market rent, the appraisers shall subscribe and swear to an oath fairly and impartially to determine such rent.

If the two appraisers are appointed by the parties as stated in the immediately preceding paragraph, they shall meet promptly and attempt to determine the fair market rent. If they are unable to agree within forty-five (45) days after the appointment of the second appraiser, they shall attempt to select a third person meeting the qualifications stated in the immediately preceding paragraph within fifteen (15) days after the last day the two appraisers are given to determine the fair market rent. If they are unable to agree on the third person to act as appraiser within said fifteen (15) day period, the third person shall be appointed by the American Arbitration Association (the "Association"), upon the application of Lessor or Lessee to the office of the Association nearest the Building. The person appointed to act as appraiser by the Association shall be required to meet the qualifications stated in the immediately preceding paragraph. Each of the parties shall bear fifty percent (50%) of the cost of appointing the third person and of paying the third person's fees. The third person, however selected, shall be required to take an oath similar to that described above.

The three appraisers shall meet and determine the fair market rent. A decision in which two of the three appraisers concur shall be binding and conclusive upon the parties. In deciding the dispute, the appraisers shall act in accordance with the rules then in force of the Association, subject however, to such limitations as may be placed on them by the provisions of this Lease.

Notwithstanding the foregoing, in no event shall the Fixed Basic Rent during the Renewal Term be less than the Fixed Basic Rent during the last year of the initial Term of this Lease.

(f)     After the fair market rent for the Renewal Term has been determined by the appraiser or appraisers and the appraiser or appraisers shall have notified the parties, at the request of either party, both parties shall execute and deliver to each other an amendment of this Lease stating the Fixed Basic Rent for the Renewal Term.

(g)     If the Fixed Basic Rent for the Renewal Term has not been agreed to or established prior to the commencement of the Renewal Term, then Lessee shall pay to Lessor an annual rent ("Temporary Rent") which Temporary Rent shall be equal to one hundred twenty-five percent (125%) of the Fixed Basic Rent payable by Lessee for the last year of the initial Term. Thereafter, if the parties shall agree upon a Fixed Basic Rent, or the Fixed Basic Rent shall be established upon the determination of the fair market rent by the appraiser or appraisers, at a rate at variance with the Temporary Rent (i) if such Fixed Basic Rent is greater than the Temporary Rent, Lessee shall promptly pay to Lessor the difference between the Fixed Basic Rent determined by agreement or the appraisal process and the Temporary Rent, or (ii) if such Fixed Basic Rent is less than the Temporary Rent, Lessor shall credit to Lessee's subsequent monthly installments of Fixed Basic Rent the difference between the Temporary Rent previously paid and the Fixed Basic Rent determined by agreement or the appraisal process.

(h)     In describing the fair market rent during the Renewal Term, the appraiser or appraisers shall be required to take into account the rentals at which leases are then being concluded (as of the last day of the initial Term) (for five (5) year leases without renewal options with the lessor and lessee each acting prudently, with knowledge and for self-interest, and assuming that neither is under undue duress) for comparable space in the Building and in comparable office buildings in the County of Morris.

(i)     The option granted to Lessee under this Article 54 may be exercised only by Lessee, its affiliates, permitted successors and assigns, and not by any subtenant or any successor to the interest of Lessee by reason of any action under the Bankruptcy Code, or by any public officer, custodian, receiver, United States Trustee, trustee or liquidator of Lessee or substantially all of Lessee's property. Lessee shall have no right to exercise this option subsequent to the date Lessor shall have the right to give the notice of termination referred to in Article 13 of the Lease unless Lessee cures the default within the applicable grace period. Notwithstanding the foregoing, Lessee shall have no right

29

to extend the term if, at the time it gives notice of its election (i) Lessee shall not be in occupancy of substantially all of the Premises or (ii) the Premises (or any part thereof) shall be the subject of a sublease. If Lessee shall have elected to extend the term, such election shall be deemed withdrawn if, at any time after the giving of notice of such election and prior to the commencement of the Renewal Term, Lessee shall sublease (all or any portion of) the Premises.

## 55.   TERMINATION OPTION:

Notwithstanding anything to the contrary contained herein, Lessee shall have a one-time option to surrender the Premises ("Termination Option") in accordance with the following terms and conditions:

a.   If Lessee desires to exercise the Termination Option, Lessee shall give Lessor irrevocable written notice ("Termination Notice") of Lessee's exercise of this Termination Option, which shall be delivered by certified mail which Termination Notice must be received by Lessor no later than the date that is nine (9) full months prior to the Termination Date. **TIME IS OF THE ESSENCE** with respect to Lessor's receipt of the Termination Notice and all other deadlines in this Article.

b.   If Lessee gives the Termination Notice and complies with all the provisions in this Article, the Lease shall terminate at 11:59 p.m. on the last day of the month during which the three (3) year and two (2) month anniversary of the Commencement Date occurs (the "Termination Date").

c.   In consideration for Lessee's termination of this Lease, Lessee shall pay Lessor $86,519.90 ("Termination Fee") simultaneously with the Termination Notice sent by Lessee to Lessor.

d.   Lessee's obligations to pay Fixed Basic Rent, Additional Rent, and any other costs or charges under this Lease, and to perform all other Lease obligations for the period up to and including the Termination Date, shall survive the termination of this Lease.

e.   Notwithstanding the foregoing, if at any time during the period on or after the date on which Lessee shall exercise its Termination Option, up to and including the Termination Date, Lessee shall be in default of this Lease, then Lessor may elect, but is not obligated, to cancel and declare null and void Lessee's exercise of the Termination Option and this Lease shall continue in full force and effect for the full Term hereof unaffected by Lessee's exercise of the Termination Option. If Lessor does not cancel Lessee's exercise of the Termination Option after Lessee's default, Lessee shall cure any default within the period of time specified in this Lease and this obligation shall survive the Termination Date.

f.   In the event Lessee exercises the Termination Option, Lessee covenants and agrees to surrender full and complete possession of the Premises to Lessor on or before the Termination Date vacant, broom-clean, in good order and condition, and, in accordance with the provisions of this Lease, and thereafter the Premises shall be free and clear of all leases, tenancies, and rights of occupancy of any entity claiming by or through Lessee.

g.   If Lessee shall fail to deliver possession of the Premises on or before the Termination Date in accordance with the terms hereof, Lessee shall be deemed to be a holdover Lessee from and after the Termination Date, and in such event all covenants and terms of Article 25 shall apply and shall also be liable to Lessor for all costs and expenses incurred by Lessor in securing possession of the Premises. Lessor may accept any such sums from Lessee without prejudice to Lessor's right to evict Lessee from the Premises by any lawful means.

h.   If Lessee properly and timely exercises the Termination Option and properly and timely satisfies all other monetary and non-monetary obligations under this Lease, the Lease as it applies to the Premises shall cease and expire on the Termination Date with the same force and effect as if said Termination Date were the date originally provided in this Lease as the Expiration Date of the Term hereof.

30

EACH PARTY AGREES that it will not raise or assert as a defense to any obligation under the Lease or this Agreement or make any claim that the Lease or this Agreement is invalid or unenforceable due to any failure of this document to comply with ministerial requirements including, but not limited to, requirements for corporate seals, attestations, witnesses, notarizations, or other similar requirements, and each party hereby waives the right to assert any such defense or make any claim of invalidity or unenforceability due to any of the foregoing.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

LESSOR:                                          LESSEE:

600 PARSIPPANY ASSOCIATES L.L.C.                 MAGNELL ASSOCIATES, INC. d/b/a
                                                 ABS COMPUTER TECHNOLOGIES, INC.

By:   Mack-Cali Realty, L.P., member

By:   Mack-Cali Realty Corporation, its general
      partner

By:   _____            By:   _____
      Michael K. Nevins                         Name:  Steven A. Cronin
      Vice President - Leasing                  Title: President ABS

EXHIBIT A

11/14/03

LOCATION OF PREMISES
MAGNELL ASSOCIATES, INC.
d/b/a ABS COMPUTER TECHNOLOGIES, INC.



MACK-CALI CORPORATE CENTER
FIRST FLOOR
600 PARSIPPANY ROAD
PARSIPPANY, NEW JERSEY 07054

MACK-CALI
Realty Corporation
11 COMMERCE DRIVE, CRANFORD, NJ 07016 (908) 272-8000 FAX (908) 272-6255

## EXHIBIT A-1

### OFFICE BUILDING AREA

All that certain tract, or parcel of land and premises, hereinafter particularly described, situate, lying and being in the Township of Parsippany-Troy Hills, in the County of Morris, and the State of New Jersey:

BEGINNING at the point of intersection of the projection of the westerly sideline of Parsippany Road and the northerly sideline of Eastman's Road, running thence South 85° 19' 57" West 96.53 feet to the true point f the beginning and running thence;

(1)  Along the northerly sideline of said Eastman's Road, 60 feet wide, South 85° 19' 57" West 393.30 feet; thence

(2)  North 53° 22' 15" West 238.00 feet; thence

(3)  North 50° 43' 10" West 216.33 feet; thence

(4)  North 39° 16' 50" East 134.14 feet along southeasterly sideline of Interstate Route 287 (formerly U.S. Route 202) as shown on a plat entitled "New Jersey State Highway Department General Property Parcel Map Route U.S. 202 Freeway Section 1" sheets 1 through 4 dated December, 1953 and filed in the Morris County Clerk's Office on February 18, 1955 as Map No. 1560-F; thence

(5)  At right angles to said Interstate Route 287 South 50° 43' 10" East 5.00 feet; thence

(6)  At right angles to the previous course and along the southerly sideline of said Interstate 287 as shown on a plat entitled "New Jersey State Highway Department General Property Parcel Map Route U.S. 202 Freeway Section 1" sheets 1 through 4 dated December, 1953 and filed in the Morris County Clerk's Office on February 18, 1955 as Map No. 1560-F, North 39° 16' 50" East 355.00 feet; thence

(7)  Leaving the southeasterly sideline of said Interstate Route 287, North 85° 16' 50" East 135.00 feet; thence

(8)  South 67° 43' 10" East 145.00 feet; thence

(9)  South 50° 43' 10" East 105.00 feet; thence

(10)  South 30° 43' 10" East 75.00 feet; thence

(11)  South 18° 24' 25" East 361.30 feet along the westerly sideline of Parsippany Road; thence

(12)  Along the westerly sideline of Parsippany Road, South 17° 35' 00" East 44.13 feet; thence

(13)  South 51° 30' 00" West 100.73 feet; to the point of BEGINNING.

The forgoing premises are shown on a survey make by Couvrette Associates Inc. Consulting Engineers, Rockaway, New Jersey, dated September 21, 1978, last revised to April 1, 1992 showing Lot 1, Block 738, Tax Maps Township of Parsippany-Troy Hills, Morris County, New Jersey.

The foregoing survey reference shall not be deemed or construed to limit or diminish the estate more particularly described above and encumbered hereby.

## EXHIBIT B

## RULES AND REGULATIONS

1. **OBSTRUCTION OF PASSAGEWAYS**: The sidewalks, entrance, passages, courts, elevators, vestibules, stairways, corridors and public parts of the Building shall not be obstructed or encumbered by Lessee or used by Lessee for any purpose other than ingress and egress. If the Premises are situated on the ground floor with direct access to the street, then Lessor shall, at Lessor's expense, keep the sidewalks and curbs directly in front of the Premises clean and free from ice, snow and refuse.

2. **WINDOWS**: Windows in the Premises shall not be covered or obstructed by Lessee. No bottles, parcels or other articles shall be placed on the windowsills, in the halls, or in any other part of the Building other than the Premises. No article shall be thrown out of the doors or windows of the Premises.

3. **PROJECTIONS FROM BUILDING**: No awnings, air-conditioning units, or other fixtures shall be attached to the outside walls or the window sills of the Building or otherwise affixed so as to project from the Building, without prior written consent of Lessor.

4. **SIGNS**: No sign or lettering shall be affixed by Lessee to any part of the outside of the Premises, or any part of the inside of the Premises so as to be clearly visible from the outside of the Premises, without the prior written consent of Lessor. However, Lessee shall have the right to place its name on any door leading into the Premises the size, color and style thereof to be subject to the Lessor's approval. Lessee shall not have the right to have additional names placed on the Building directory without Lessor's prior written consent.

5. **FLOOR COVERING**: Lessee shall not lay linoleum or other similar floor covering so that the same shall come in direct contact with the floor of the Premises. If linoleum or other similar floor covering is desired to be used, an interlining of builder's deadening felt shall first be fixed to the floor by a paste or other material that may easily be removed with water, the use of cement or other similar adhesive material being expressly prohibited.

6. **INTERFERENCE WITH OCCUPANTS OF BUILDING**: Lessee shall not make, or permit to be made, any unseemly or disturbing noises or odors and shall not interfere with other tenants or those having business with them. Lessee will keep all mechanical apparatus in the Premises free of vibration and noise which may be transmitted beyond the limits of the Premises.

7. **LOCK KEYS**: No additional locks or bolts of any kind shall be placed on any of the doors or windows by Lessee. Lessee shall, on the termination of Lessee's tenancy, deliver to Lessor all keys to any space within the Building either furnished to or otherwise procured by Lessee, and in the event of the loss of any keys furnished, Lessee shall pay to Lessor the cost thereof. Lessee, before closing and leaving the Premises, shall ensure that all windows are closed and entrance doors locked. Nothing in this Paragraph 7 shall be deemed to prohibit Lessee from installing a burglar alarm within the Premises, provided: (1) Lessee obtains Lessor's consent which will not be unreasonably withheld or delayed; (2) Lessee supplies Lessor with copies of the plans and specifications of the system; (3) such installation shall not damage the Building; and (4) all costs of installation shall be borne solely by Lessee.

8. **CONTRACTORS**: No contract of any kind with any supplier of towels, water, toilet articles, waxing, rug shampooing, venetian blind washing, furniture polishing, lamp servicing, cleaning of electrical fixtures, removal of waste paper, rubbish, garbage, or other like service shall be entered into by Lessee, nor shall any machine of any kind be installed in the Building or the Office Building Area without the prior written consent of the Lessor. Lessee shall not employ any persons other than Lessor's janitors for the purpose of cleaning the Premises without prior written consent of Lessor. Lessor shall not be responsible to Lessee for any loss of property from the Premises however occurring, or for any damage to the effects of Lessee by such janitors or any of its employees, or by any other person or any other cause.

9. **PROHIBITED ON PREMISES**: Lessee shall not conduct, or permit any other person to conduct, any auction upon the Premises, manufacture or store goods, wares or merchandise

upon the Premises without the prior written approval of Lessor, except the storage of usual supplies and inventory to be used by Lessee in the conduct of his business, permit the Premises to be used for gambling, make any unusual noises in the Building, permit to be played musical instrument on the Premises, permit any radio to be played, or television, recorded or wired music in such loud manner as to disturb or annoy other tenants, or permit any unusual odors to be produced on the Premises. Lessee shall not permit any portion of the Premises to be occupied as an office for a public stenographer or typewriter, or for the storage, manufacture, or sale of intoxicating beverages, narcotics, tobacco in any form or as a barber or manicure shop. Canvassing, soliciting and peddling in the Building and the Office Building Area are prohibited and Lessee shall cooperate to prevent the same. No bicycles, vehicles or animals of any kind shall be brought into or kept in or about the Premises.

10. <u>**PLUMBING, ELECTRIC AND TELEPHONE WORK**</u>: Plumbing facilities shall not be used for any purpose other than those for which they were constructed; and no sweepings, rubbish, ashes, newspaper or other substances of any kind shall be thrown into them. Waste is prohibited. When electric wiring of any kind is introduced, it must be connected as directed by Lessor, and no stringing or cutting of wires will be allowed, except by prior written consent of Lessor, and shall be done by contractors approved by Lessor. The number and locations of telephones, telegraph instruments, electrical appliances, call boxes, etc. shall be subject to Lessor's approval.

11. <u>**MOVEMENT OF FURNITURE, FREIGHT OR BULKY MATTER**</u>: The carrying in or out of freight, furniture or bulky matter of any description must take place during such hours as Lessor may from time to time reasonably determine and only after advance notice to the superintendent of the Building. The persons employed by Lessee for such work must be reasonably acceptable to the Lessor. Lessee may, subject to these provisions, move freight, furniture, bulky matter, and other material into or out of the Premises on Saturdays between the hours of 9:00 a.m. and 1:00 p.m., provided Lessee pays additional costs, if any, incurred by Lessor for elevator operators or security guards, and for any other expenses occasioned by such activity of Lessee. If, at least three (3) days prior to such activity, Lessor requests that Lessee deposit with Lessor, as security of Lessee's obligations to pay such additional costs, a sum of which Lessor reasonably estimates to be the amount of such additional cost, the Lessee shall deposit such sum with Lessor as security of such cost. There shall not be used in the Building or Premises, either by Lessee or by others in the delivery or receipt of merchandise, any hand trucks except those equipped with rubber tires and side guards, and no hand trucks will be allowed in the elevators without the consent of the superintendent of the Building.

12. <u>**SAFES AND OTHER HEAVY EQUIPMENT**</u>: Lessor reserves the right to prescribe the weight and position of all safes and other heavy equipment so as to distribute properly the weight thereof and to prevent any unsafe condition from arising.

13. <u>**ADVERTISING**</u>: Lessor shall have the right to prohibit any advertising by Lessee which in Lessor's reasonable opinion tends to impair the reputation of the Building or its desirability as a building for offices, and upon written notice from Lessor, Lessee shall refrain from or discontinue such advertising.

14. <u>**NON-OBSERVANCE OR VIOLATION OF RULES BY OTHER TENANTS**</u>: Lessor shall not be responsible to Lessee for non-observance or violation of any of these rules and regulations by any other tenant.

15. <u>**AFTER HOURS USE**</u>: Lessor reserves the right to exclude from the Building between the hours of 6:00 p.m. and 8:00 a.m. and at all hours on Saturdays, Sundays and Building Holidays, all persons who do not present a pass to the Building signed by the Lessee. Each Lessee shall be responsible for all persons for whom such a pass is issued and shall be liable to the Lessor for the acts of such persons.

16. <u>**PARKING**</u>:  Lessee and its employees shall park their cars only in those portions of the parking area designated by Lessor.

17. Lessor hereby reserves to itself any and all rights not granted to Lessee hereunder, including, but not limited to, the following rights which are reserved to Lessor for its purposes in operating the Building:

N:\JM PLEASANT\69 PLEASANT ROAD, PLEASANT\LEASE\RULES\CHAPTER LEASE - CLEAN.DOC

Exhibit B - Page 2

a) the exclusive right to the use of the name of the Building for all purposes, except that Lessee may use the name as its business address and for no other purposes; and

b) the right to change the name or address of the Building, without incurring any liability to Lessee for doing so; and

c) the right to install and maintain a sign on the exterior of the Building; and

d) the exclusive right to use or dispose of the use of the roof of the Building; and

e) the right to limit the space on the directory of the Building and all space directories on the floor to be allotted to Lessee, provided, however, in all instances Lessee shall be provided at least one listing on each such directory; and

f) the right to grant to anyone the right to conduct any particular business or undertaking in the Building.

18. The Lessee shall be responsible for initiating, maintaining and supervising all health and safety precautions and/or programs required by Law in connection with the Lessee's use and occupancy of the Premises.

19. The Lessee shall not store, introduce or otherwise permit any material known to be hazardous within the Premises. Any material within the Premises which is determined to be hazardous shall be removed and properly disposed of by the Lessee at the Lessee's sole expense.

-- END --

## EXHIBIT C

### NOTES

RE:     Workletter Agreement for office space on the first (1st) floor at 600 Parsippany Road, Parsippany, New Jersey.

, 2003

LESSEE:

## MAGNELL ASSOCIATES, INC d/b/a ABS COMPUTER TECHNOLOGIES, INC.

You ("Lessee") and we ("Lessor") are executing simultaneously with this Workletter Agreement a written lease ("Lease"), covering the space referred to above, as more particularly described in the Lease ("Premises").

To induce Lessee to enter into the Lease (which is hereby incorporated by reference) and in consideration of the covenants hereinafter contained, Lessor and Lessee mutually agree as follows:

1.    Lessor shall have its architect prepare the following architectural and mechanical drawings and specifications based upon the sketch layout supplied to Lessor by Lessee, attached hereto and made a part hereof, upon full execution of this Lease.

   a.    Architectural drawings and specifications for Lessee's partition layout, reflected ceiling, placement of electrical outlets and other installations for the work to be done by Lessor.

   b.    Mechanical plans and specifications where necessary for installation of air conditioning systems, ductwork and heating.

   All such plans and specifications are expressly subject to Lessor's written approval, which Lessor covenants it will not unreasonably withhold.

2.    Lessor agrees to cause the partition plan, electrical plan and the reflected ceiling plan to be delivered to Lessee on or before the fifteenth (15th) day after Lease execution. Lessee agrees to approve said plans by initialing and returning same to Lessor within five (5) days of receipt of each plan or disapprove said plans within the same timeframe and notify Lessor as to precisely why same were disapproved. If Lessee disapproves same, Lessor and Lessee shall work together to modify such plans as necessary so as to be approved by Lessee. Upon approval of the plans initialed by Lessee, Lessor shall file said plans with the appropriate governmental agencies.

3.    Lessor agrees, at its expense and without charge to Lessee (unless otherwise provided), to do the work in the Premises as shown on the plans attached hereto and described on the "Description of Materials" schedule attached hereto which shall hereinafter be referred to as "The Work". The Work shall include Lessor's general conditions and overhead amounts indicated on the Description of Materials. "Building Standard" shall mean the type and grade of material, equipment and/or device designated by Lessor as standard for the Building. All items are Building Standard unless otherwise noted. The provisions of Article 6 of the Lease shall apply to any alterations made to the Premises after the initial work to be performed herein. Without limiting the general nature of the prior sentence, Lessee shall not be obligated to remove The Work from the Premises at the expiration of the Term.

4.    Intentionally omitted.

5.    All low partitioning, workstation modules, bank screen partitions and prefabricated partition systems shall be furnished and installed by Lessee.

6.    The installation or wiring of telephone and computer (data) outlets is not part of The Work. Lessee shall bear the responsibility to provide its own telephone and data systems at Lessee's sole cost and expense. Lessor shall provide Lessee access to risers and Building conduits as reasonably necessary. Upon expiration or sooner termination of the Lease, Lessee shall remove all telephone and data equipment and wiring from the Premises and the Building

Exhibit C - Page 1

risers upon vacation of same.

7. Changes in The Work, if necessary or requested by the Lessee, shall be accomplished after the execution of the Lease and this Workletter Agreement, and without invalidating any part of the Lease or Workletter Agreement, by written agreement between Lessor and Lessee hereinafter referred to as a Change Order. Each Change Order shall be prepared by Lessor and signed by both Lessee and Lessor stating their agreement upon all of the following:

    a.    The scope of the change in The Work; and

    b.    The cost of the change; and

    c.    Manner in which the cost will be paid or credited; and

    d.    The estimated extent of any adjustment to the Commencement Date (if any) as a result of the change in The Work.

Each and every Change Order shall be signed by Lessor's and Lessee's respective construction representatives. In no event shall any Change Order(s) be permitted without such authorizations. A 7% supervision plus 7% overhead charge will be added to the cost of any Change Order and to the cost of any other work to be performed by Lessor in the Premises after Lessor's completion of The Work. If Lessee shall fail to approve any such Change Order within one (1) week, the same shall be deemed disapproved in all respects by Lessee and Lessor shall not be authorized to proceed thereon. Any increase in the cost of The Work or the change in The Work stated in a Change Order which results from Lessee's failure to timely approve and return said Change Order shall be paid by the Lessee. Lessee agrees to pay to Lessor the cost of any Change Order promptly upon receipt of an invoice for same.

8. If Lessee elects to use the architect suggested by Lessor, this architect becomes the Lessee's agent solely with respect to the plans, specifications and The Work. If any change is made after completion of schematic drawings and prior to completion of final construction documents which result in a Change Order and additional costs, such costs shall be the responsibility of the Lessee.

9. Within a reasonable time after the completion of The Work, Lessee shall identify and list any portion of The Work which does not conform to this Workletter Agreement ("Punch List"). The Lessor shall review with the Lessee all of the items so listed and use reasonable efforts to correct or complete any portion of The Work which fails to conform to the requirements of this Workletter Agreement within thirty (30) days of the completion of such list.

10. The terms contained in the Lease (which include all exhibits attached thereto) constitute Lessor's agreement with Lessee with respect to the work to be performed by Lessor on Lessee's behalf. If the architectural drawings are in conflict with the terms of the Lease, then the Lease shall be deemed the controlling document.

11. All materials and installations constructed for the Lessee within the Premises shall become the property of the Lessor upon installation. No refund, credit or removal of said items is to be permitted at the termination of the Lease. Items installed that are not integrated in any such way with other common building materials do not fall under this provision (e.g. shelving, furniture, etc.).

    12.    Intentionally omitted.

13. Lessor shall permit Lessee and its agents to enter the Premises prior to the Commencement Date in order that Lessee may perform through its own non-union contractors (or union contractor if required by Lessor) such other work and decorations as Lessee may desire at the same time Lessor's contractors are working in the Premises. The foregoing license to enter prior to the Commencement Date, however, is conditioned upon:

    a.    Lessee's workmen and mechanics working in harmony and not interfering with the labor employed by Lessor, Lessor's mechanics or contractors or by any other Lessee or its mechanics or contractors; and

b.    Lessee providing Lessor with evidence of Lessee's contractors and subcontractors carrying such worker's compensation, general liability, personal and property insurance as required by law and in amounts no less than the amounts set forth in Article 30 of the Lease. If at any time such entry shall cause disharmony or interference therewith, this license may be withdrawn by Lessor upon forty-eight (48) hours written notice to Lessee. Such entry shall be deemed controlled by all of the terms, covenants, provisions and conditions of said Lease, except as to the covenant to pay Fixed Basic Rent and Additional Rent. Lessor shall not be liable in any way for any injury, loss or damage which may occur to any of Lessee's decorations or installations so made prior to the Commencement Date, the same being solely at Lessee's risk.

14.    No part of the Premises shall be deemed unavailable for occupancy by the Lessee, or shall any work which the Lessor is obligated to perform in such part of the Premises be deemed incomplete for the purpose of any adjustment of Fixed Basic Rent payable hereunder, solely due to the non-completion of details of construction, decoration or mechanical adjustments which are minor in character and the non-completion of which does not materially interfere with the Lessee's use of such part of the Premises.

15.    Lessee is responsible for all costs related to the repairs and maintenance of any additional or supplemental HVAC systems, appliances and equipment installed to meet Lessee's specific requirements. Lessee shall purchase a service contract for this equipment so that the equipment is covered by such service contract each year of the term of the Lease and shall forward a copy of such contract to Lessor.

16.    If construction is to occur in a space occupied by Lessee's employees, Lessee shall be liable for all costs associated with a delay if Lessee shall fail to comply with a submitted construction schedule to relocate personnel, furniture, or equipment. These costs shall include, but not be limited to the following:

a.    cost of construction workers time wasted; and

b.    cost of any overtime work necessary to meet schedule deadlines; and

c.    any other costs associated with delays in final completion.

17.    This workletter is based on the quantities and specifications listed herein. Any change to these specifications shall require the recalculation of the construction costs. Such recalculation shall not negate any other section of this Lease.

18.    All sums payable by Lessee to Lessor in connection with this Exhibit C and any other work to be performed by Lessor within the Premises and billable to Lessee shall be deemed Additional Rent.

19.    With respect to the construction work being conducted in or about the Premises, each party agrees to be bound by the approval and actions of their respective construction representatives. Unless changed by written notification, the parties hereby designate the following individuals as their respective construction representatives:

FOR LESSOR:                          FOR LESSEE:

_____          _____

c/o Mack-Cali Realty Corporation    _____

_____          _____

_____

Exhibit C - Page 3

## EXHIBIT C - 1

### AIR CONDITIONING & HEATING DESIGN STANDARDS

The following are design standards for the building air-conditioning system for cooling and heating in the air in the subject building:

1. During the normal heating season to maintain an average indoor dry bulb temperature of not less than 70 degrees F (21 degrees C) or more than 76 degrees (24.4 degrees C) when the outdoor dry bulb temperature is lower than 65 degrees F (18 degrees C) but not lower than 0 degrees F (-13 degrees C).

2. To maintain comfort cooling for an average indoor dry bulb temperature of not more than 78 degrees F when the outside dry bulb temperature is 95 degrees F (24 degrees C).

3. During the intermediate seasons, when the outside dry bulb temperature is below 55 degrees (13 degrees C), cooling will be provided by outside air usage in conjunction with operating of return air, outside air and exhaust air dampers.

4. To furnish not less than .10 cubic foot of fresh air per minute per square foot of rentable area, and between .20 and 1.0 cubic feet of total air per minute, per square foot of rentable occupied space.

5. Lessor will not be responsible for the failure of the air-conditioning system if such failure results from (i) the occupancy of the Premises with more than an average of one (1) person for each one hundred (100) usable square feet of floor area (ii) the installation or operation by Lessee of machines and appliances, the installed electrical load of which when combined with the load of all lighting fixtures exceeds five (5) watts per square foot of floor area and in any manner exceeding the aforementioned occupancy and electrical load criteria, or (iii) rearrangement of partitioning after the initial preparation of the Premises. If interference with normal operation of the air-conditioning system in the Premises results, necessitating changes in the air conditioning system servicing the Premises, such changes shall be made by Lessor upon written notice to Lessee at Lessee's sole cost and expense. Lessee agrees to lower and close window coverings when necessary because of the sun's position whenever the air conditioning system is in operation, and Lessee agrees at all times to cooperate fully with Lessor and to abide by all the Rules and Regulations attached hereto as well as reasonable rules and regulations which Lessor may hereafter prescribe involving the air-conditioning system.

-- END --

## EXHIBIT D

### CLEANING SERVICES
(Five Nights Per Week)

## LESSEE'S PREMISES

1. Vacuum clean all carpeted areas.

2. Sweep and dust mop all non-carpeted areas. Wet mop whenever necessary.

3. All office furniture such as desks, chairs, files, filing cabinets, etc. shall be dusted with a clean treated dust cloth whenever necessary and only if such surfaces are clear of Lessee's personal property including but not limited to plants.

4. Empty and wash ashtrays.

5. Empty wastepaper baskets and remove waste to the designated areas.

6. All vertical surfaces within arms reach shall be spot cleaned to remove finger marks and smudges. Baseboard and window sills are to be spot cleaned whenever necessary.

7. All cleaning of cafeterias, vending areas, kitchen facilities are excluded. Lessee may make necessary arrangements for same directly with Lessor's cleaning maintenance company.

8. Cleaning hours shall be Monday through Friday between 5:30 p.m. and 11:00 p.m.

9. No cleaning service is provided on Saturday, Sunday and Building Holidays.

10. Cartons or refuse in excess which can not be placed in wastebaskets will not be removed. Lessee is responsible to place such unusual refuse in trash dumpster.

11. Cleaning maintenance company will not remove nor clean tea, office cups or similar containers. If such liquids are spilled in waste baskets, the waste baskets will be emptied but not otherwise cleaned. Lessor will not be responsible for any stained carpet caused from liquids leaking or spilling from Lessee's wastepaper receptacles.

12. Upon completion of cleaning, all lights will be turned off and doors locked leaving the Premises in an orderly condition.

13. Glass entrance doors will be cleaned nightly. Interior glass doors or glass partitions are excluded. Lessee may make arrangements for same with Lessor's cleaning maintenance company.

## COMMON AREAS

1. Vacuum all carpeting in entrance lobbies, outdoor mats and all corridors.

2. Wash glass doors in entrance lobby with a clean damp cloth and dry towel.

3. Clean cigarette urns. Sweep and/or wet mop all resilient tile flooring. Hard surface floors such as quarry tile, etc., shall be cleaned nightly.

4. Wash, clean and disinfect water fountains.

5. Clean all elevators and stairwells.

6. Lavatories -- Men and Women.
   a. Floors in all lavatories shall be wet mopped each evening with a germicidal detergent to ensure a clean and germ free surface.
   b. Wash and polish all mirrors, shelves, bright work including any piping and toilet seats.
   c. Wash and disinfect wash basins and sinks using a germicidal detergent.
   d. Wash and disinfect toilet bowls and urinals.

e.  Keep lavatory partitions, tiled walls, dispensers and receptacles in a clean condition using a germicidal detergent when necessary.

f.  Empty and sanitize sanitary disposal receptacles.

g.  Fill toilet tissue holders, towel dispensers and soap dispensers. Refills to be supplied by Lessor.

7.  Clean all air ventilation grill work in ceilings.

## EXHIBIT E

### BUILDING HOLIDAYS

### BUILDING CLOSED

* NEW YEAR'S DAY *

* MEMORIAL DAY *

* INDEPENDENCE DAY *

* LABOR DAY *

* THANKSGIVING DAY *

* CHRISTMAS DAY *

-- END --

## EXHIBIT F

## TENANT ESTOPPEL CERTIFICATE

TO: MORTGAGEE and/or its affiliates and/or whom else it may concern:

1.    The undersigned is the Lessee (Tenant) under that certain Lease dated _____ by and between _____ as Lessor (Landlord) and _____ as Lessee, covering those certain premises commonly known and designated as ___ r.s.f. on the ____( ) floor of _____ ,NJ.

2.    The Lease has not been modified, changed, altered or amended in any respect (except as indicated following this sentence) and is the only Lease or agreement between the undersigned and the Lessor affecting said premises. If none, state "none".

3.    The undersigned has made no agreements with Lessor or its agents or employees concerning free rent, partial rent, rebate of rental payments or any other type of rental concession not expressly set forth in the Lease (except as indicated following this sentence). If none, state "none".

4.    The undersigned has accepted and now occupies the premises, and is and has been open for business since __ ____, 200_. The Lease term began _____, 200_, and the rent for said premises has been paid to and including _____ , 200_ in conformity with this Lease agreement. No rent has been prepaid for more than two (2) months. The fixed minimum rent being paid as above is $ _____ per month. If Lessee is not in full possession, whether Lessee has assigned the Lease, sublet all or any portion of the Premises, or otherwise transferred any interest in the Lease or the Premises, Lessee agrees to provide a copy of such assignment, sublease, or transfer upon request.

5.    The Lease is not in default and is in full force and effect. As of the date hereof, the undersigned is entitled to no credit, no free rent and no offset or deduction in rent not expressly set forth in the Lease.

6.    All alterations, improvements, additions, build-outs, or construction required to be performed under the Lease have been completed in accordance with the terms of the Workletter attached to Lease as Exhibit C.

7.    The Lease does not contain and the undersigned doesn't have any outstanding options or rights of first refusal to purchase the premises or any part thereof or the real property of which the premises are a part.

8.    No actions, whether voluntary or otherwise, are pending against the undersigned under the bankruptcy laws of the United States or any State thereof except as set forth herein.

9.    There are currently no valid defenses, counterclaims, off-sets, credits, deductions in rent, or claims against the enforcement of any of the agreements, terms, or conditions of the Lease except as set forth herein.

10.   The undersigned acknowledges that all the interest of Lessor in and to the above-mentioned Lease is being duly assigned to MORTGAGEE or one of its affiliates hereunder and that pursuant to the terms thereof (i) all rental payments under said Lease shall continue to be paid to Lessor in accordance with the terms of the Lease unless and until you are otherwise notified in writing by MORTGAGEE, or its successor or assigns and (ii) no modification, revision, or cancellation of the Lease or amendments thereto shall be effective unless a written consent thereto of such mortgagee is first obtained.

11.   The undersigned is authorized to execute this Tenant Estoppel Certificate on behalf of the Lessee.

Dated this _____ day of _Necember_____ , 2003

LESSEE:

_____
Name:
Title:

## EXHIBIT G

### COMMENCEMENT DATE AGREEMENT

**1.0   PARTIES**

THIS AGREEMENT made the _____ day of _____, 2003 is by and between _____ (hereinafter "Lessor") whose address is c/o Mack-Cali Realty Corporation, 11 Commerce Drive, Cranford, New Jersey 07016 and _____ (hereinafter "Lessee") whose address is _____

**2.0   STATEMENT OF FACTS**

2.1   Lessor and Lessee entered into a Lease dated _____, 2003 (hereinafter "Lease") setting forth the terms of occupancy by Lessee of approximately _____ rentable square feet on the _____ (__) floor (hereinafter "Premises") at _____ (hereinafter "Building"); and

2.2   The Term of the Lease is for _____ (__) months with the Commencement Date of the initial Term being defined in the Preamble to the Lease as being subject to change under Articles 27 and 43 thereof; and

2.3   It has been determined in accordance with the provisions of Articles 27 and 43 of the Lease that _____, 200_ is the Commencement Date of the Term of the Lease.

**3.0   STATEMENT OF TERMS**

NOW, THEREFORE, in consideration of the Premises and the covenants hereinafter set forth, it is agreed:

3.1   The Commencement Date of the Term of the Lease is _____, 2003 and the Expiration Date thereof is _____, 200_ and the Lease Preamble Articles 6 and 9 shall be deemed modified accordingly.

3.2   Article 10 of the Preamble shall be deemed modified as follows:

3.3   This Agreement is executed by the parties hereto for the purpose of providing a record of the Commencement and Expiration Dates of the Lease, adjust the Term of the Lease and Fixed Basic Rent amount accordingly.

EXCEPT as modified herein, the Lease covering the Premises shall remain in full force and effect as if the same were set forth in full herein and Lessor and Lessee hereby ratify and confirm all the terms and conditions thereof.

THIS AGREEMENT shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.

EACH PARTY AGREES that it will not raise or assert as a defense to any obligation under the Lease or this Agreement or make any claim that the Lease or this Agreement is invalid or unenforceable due to any failure of this document to comply with ministerial requirements including, but not limited to, requirements for corporate seals, attestations, witnesses, notarizations, or other similar requirements, and each party hereby waives the right to assert any such defense or make any claim of invalidity or unenforceability due to any of the foregoing.

IN WITNESS THEREOF, Lessor and Lessee have hereunto set their hands and seals the date and year first above written and acknowledge one to the other they possess the requisite authority to enter into this transaction and to sign this Agreement.

LESSOR                                                    LESSEE

By: _____          By: _____
    Michael K. Nevins                         Name:
    Vice President - Leasing                   Title: _____

## COMMISSION AGREEMENT

**LESSOR:**     600 PARSIPPANY ASSOCIATES, LLC

**LESSEE:**     MAGNELL ASSOCIATES, INC.
         d/b/a ABS COMPUTER TECHNOLOGIES, INC.

**LESSEE'S BROKER:**  NEWMARK REAL ESTATE OF NEW JERSEY, LLC

### 1.0  PARTIES

  THIS AGREEMENT made this _22nd_ day of _Apri_, 2004 between 600 Parsippany Associates, LLC ("Lessor") with offices located at c/o Mack-Cali Realty Corporation, 11 Commerce Drive, Cranford, New Jersey 07016 and Newmark Real Estate of New Jersey, LLC ("Lessee's Broker") with offices located at 301 Route 17 North, Rutherford, New Jersey 07070.

### 2.0  STATEMENT OF FACTS

2.1  Lessor is the owner of 600 Parsippany Road, Parsippany, New Jersey ("Building"); and

2.2  Lessee's Broker has been retained by Magnell Associates, Inc. d/b/a ABS Computer Technologies, Inc. ("Lessee") to represent it in the negotiation of a lease for approximately 5,562 gross rentable square feet of office space on the first (1st) floor ("Premises") of the Building; and

2.3  Lessee's Broker represents it dealt with no other broker or brokers in connection with this transaction.

  NOW THEREFORE, Lessor agrees that Lessee's Broker shall receive a commission resulting from this transaction subject to the following:

### 3.0  STATEMENT OF TERMS

3.1  **Commission** -- Provided Lessee (i) executes a lease in form and upon terms satisfactory to Lessor, (ii) submits the security deposit required under the lease and (iii) actually occupies the Premises and pays the second month's rent, Lessee's Broker shall be entitled to a commission which is derived by subtracting the total concession from the aggregate basic rental for the initial term and multiplying the remainder by five percent (5%).

Said sum shall be due and payable only as follows:

Fifty percent (50%) upon occupancy and the payment of the second (2nd) month's rent for the initial term and fifty percent (50%) six (6) months later.

3.2  **Renewals and Extensions** -- Should Lessee renew or extend this Lease, as the case may be, pursuant to any options contained in said Lease or otherwise, and no other broker was involved, Lessee's Broker shall be entitled to a commission equal to five percent (5%) of the aggregate basic rental for the respective renewal or extension term, as the case may be.

Said sum shall be due and payable only as follows:

Fifty percent (50%) upon payment of the second (2nd) month's rent applicable to the renewal period or the extension period, as the case may be, and fifty percent (50%) six (6) months later.

3.3  **Additional Space** -- If Lessee leases additional space in the Building during the initial term of the lease, and no other broker was involved, then Lessee's Broker shall be entitled to a commission equal to the aggregate basic rental for the additional space multiplied by five percent (5%), less the unearned commission for space, if any, surrendered by Lessee.

Said sum shall be due and payable as follows:

Fifty percent (50%) upon payment of the second (2nd) month's rent applicable to the expansion space and fifty percent (50%) six (6) months later.

3.4  **Limitation** -- In no event shall Lessor be liable to Lessee's Broker for any commissions applicable to any renewals or extensions beyond ten (10) years from the initial term commencement date (December 15, 2003) of the Lease between Lessor and Lessee.

3.5   **Default** -- In the event Lessee is in default or a petition (voluntary or involuntary) in bankruptcy is filed against Lessee at a time when a payment is due hereunder, said payment shall be deferred until the default is resolved or the Lease is assumed by the trustee in bankruptcy upon all of the terms and conditions of said Lease. If the Lease is terminated as a result of the default or rejected by the bankruptcy trustee, any obligation of Lessor to Lessee's Broker as to the deferred payment and all subsequent payments provided for herein shall cease.

3.6   **Lessee's Broker's Representation** -- Lessee's Broker represents it is duly licensed real estate broker in good standing in the State of New Jersey.

3.7   **Successors and Assigns** -- In the event of a sale of the Building, Lessor shall have the new owner assume any obligations hereunder that may, at the time of transfer, still exist, and upon the assumption by said new owner, Lessor shall be released from liability hereunder. This Agreement shall be binding upon the parties hereto, their respective heirs, successors and assigns, but shall be null and void if placed of record.

3.8   **Hold Harmless** -- Lessee's Broker and Lessor each agree to hold the other harmless from any and all claims resulting from any conduct inconsistent with the representations tendered by them to the other herein. In no event will Lessor be obligated to pay Lessee's Broker pursuant to this hold harmless any amount in excess of the commission(s) provided for herein, which are then due and owing, and in no event will Lessee's Broker's liability exceed the commission(s) it has received hereunder or would then be entitled to.

3.9   **Publicity** -- Lessee's Broker shall not issue any press release or public statement with respect to this transaction without prior review and written consent of Lessor.

3.10  **Confidentiality** -- Lessee's Broker agrees not to disclose to any person, corporation, partnership, association, newspaper, periodical or other entity, any of the terms, covenants, conditions, or other facts with respect to (i) the lease upon which this agreement is based and (ii) this commission agreement, except for the Lessee's name, address and size of the transaction. This non-disclosure and confidentiality clause shall be binding upon Lessee's Broker subsequent to the payment of the commission, as well as prior thereto.

3.11  **Governing Law** -- This agreement shall be construed according to the laws of the State of New Jersey by the State Courts of New Jersey.

3.12  **Recording** -- The parties acknowledge that this Agreement shall not be recorded or placed of record and should Lessee's Broker place this Agreement of record at any time, the Agreement shall be null and void and the obligations contained herein of no further force and effect.

3.13  **Authority** -- The parties affixing their signatures hereto, hereby warrant they have due authority to enter into this Agreement.

3.14  **Complete Agreement** -- This constitutes the entire agreement between the parties hereto and this Agreement may not be modified, supplemented or amended except in writing signed by all parties.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first written above.

LESSOR:                                    LESSEE'S BROKER:

By:   Mack-Cali Realty L.P., member         NEWMARK REAL ESTATE OF
                                            NEW JERSEY, LLC

By:   Mack-Cali Realty Corporation,
      its general partner

By:   _____               By:  _____
      Michael K. Nevins                           Name: William Cooke
      Vice President of Leasing                   Title: Managing Partner

Exhibit B

# EMERY CELLI BRINCKERHOFF & ABADY LLP

RICHARD D. EMERY
ANDREW G. CELLI
MATTHEW D. BRINCKERHOFF
JONATHAN S. ABADY
ILANN M. MAAZEL
ERIC HECKER
MARIANN MEIER WANG
SARAH NETBURN
KATHERINE ROSENFELD
O. ANDREW F. WILSON
ELIZABETH S. SAYLOR
KENNISHA A. AUSTIN
DEBRA L. GREENBERGER
ELORA MUKHERJEE

ATTORNEYS AT LAW
75 ROCKEFELLER PLAZA
NEW YORK, NEW YORK 10019

TELEPHONE
(212) 763-5000
FACSIMILE
(212) 763-5001
WEB ADDRESS
www.ecbalaw.com

November 16, 2007

Eric C. Ruland, Esq.
136 East Main Street
East Islip, NY 11730

Re: *Newegg sublease of 600 Parsippany Road with Franklin First Financial*

Dear Eric:

This will confirm that your client Franklin First Financial ("FFF"), following its failure to pay rent to Newegg for the last few months, has agreed to the following payment plan for approximately $50,058 in back rent:

(1)   $25,000 will be paid to Newegg immediately (no later than this Tuesday, 11/20/7);

(2)   the remaining amount of $25,058 will be paid in 12 equal monthly installments of $2,088.17 over the next year (starting one month from now);

(3)   If FFF is for any reason late on either the payment plan or its regular rent going forward, FFF will pay 8.5% interest, compounded monthly, on any overdue payments;

(4)   FFF will within the next week pay Newegg's attorneys' fee in this matter directly to Emery Celli Brinckerhoff & Abady. The fee to date is $1,640 (*see* attached summary bill).

The above payment plan is of course in addition to the regular payments FFF must make under the sublease, for the remainder of the sublease. Newegg reserves all of its legal rights under the sublease.



EMERY CELLI BRINCKERHOFF & ABADY LLP
Page 2

    If this letter accurately sets forth your understanding, please sign on the line above your name and return the executed copy to me by fax or email.

             Sincerely,

             Ilann M. Maazel

Accepted and Agreed
Eric Ruland, Esq.
On Behalf of Franklin First Financial

Dated: _____

c:  Christine T. Smith
   Craig L Wu

2